## 40941. ELLIOTT v. THE STATE.
(320 SE2d 361)

BELL, Justice.

Elliott was convicted of the murder of Victoria Phillips, and received a life sentence. His motion for new trial was denied, and he now appeals. We affirm.

Elliott and Phillips lived together for nearly a year before the victim's death. On September 11, 1982, Phillips, Blaine Smith, and Cassandra Dixon were walking toward Grady Homes, a public housing apartment complex in Fulton County, Georgia. As they neared Grady Homes, Dixon left the other two to visit a friend, while Victoria and Smith went to visit a relative of Victoria. Dixon testified that after she left Grady Homes and was on her way to Capitol Homes

Apartments, she saw Elliott, who was carrying a knife and who asked her if she knew where Phillips was. She told him that Phillips was somewhere in the Capitol Homes Apartment complex. Smith testified that after visiting with Victoria's relative, he and Victoria began to walk back toward Capitol Homes. On the way, they stopped at the Ram's Den Lounge so that he could inquire about a job. Smith went in the Ram's Den, while Victoria waited outside. When he came back outside, Elliott had Victoria on the ground, beating her. Smith said that he asked Elliott why he was beating Victoria, and that Elliott responded that "this is my bitch, . . . you ain't got nothing to do with it." Smith said he did not intervene because Elliott had a knife in his hand, although he was not using it on Victoria. According to Smith, Elliott told Victoria, "[b]itch, I'm going to kill you."

Smith then ran to get assistance from Roderick Withers, who lived nearby. After calling Victoria's relatives and telling them of the incident, Smith and Withers returned to the scene, but found neither Victoria nor Elliott. Later that evening Victoria was found, badly beaten, near her apartment, and was taken to a hospital to receive treatment. Cassandra Dixon testified that shortly after Victoria was taken to the hospital, Elliott came by her apartment. She said that when she told him about Victoria's condition, and asked him why he did that to her, he said that "the bitch needed to die." In addition, Withers said that three days after Victoria's beating he and Smith saw Elliott, and that when Smith asked Elliott why he had beaten Victoria, Elliott responded that Victoria needed to die.

Victoria was comatose when she arrived at the hospital and never regained consciousness, dying 16 days after the beating. The neurosurgeon in charge of her treatment testified that although Victoria's doctors initially thought Victoria's coma might have been partially the result of a birth defect, they never could prove the accuracy of that theory, and determined that her coma was probably caused solely by her severe head injuries. The neurosurgeon said that without the benefit of an autopsy she could not be 100 percent certain whether the birth defect existed. The doctor also testified that Victoria contracted pneumonia at the hospital, a common problem of severely head-injured patients who live for a period of time, and that the pneumonia contributed to her death. The autopsist, Dr. Saleh Zaki of the Fulton County Medical Examiner's Office, testified that Victoria had bruises on her eyelids, a laceration near her left eye, bruises on her right and left forehead, extensive bruises on the left side of her head, and severe swelling of the entire brain. He said that blunt force trauma caused these injuries. She had a severe infection of the lungs, which was caused and aggravated by the lower resistance resulting from the head trauma. His opinion was that Victoria died from the delayed effect of head trauma, specifically the severe infec-

tion resulting therefrom.

Several witnesses testified that Elliott physically abused Victoria during their relationship by doing such things as slapping her to the ground; pushing her out a window, causing her to break a leg; and hitting her in the throat and head. On April 7, 1982, after one of these incidents, Victoria's mother assisted Victoria in obtaining a warrant for Elliott's arrest. A witness also testified that on September 10, 1982, she heard Elliott call Victoria a whore, and saw him beat her.

1. In his fifth enumeration of error Elliott contends that the trial court erred in denying his motion for new trial on the general grounds. Among other things, Elliott contends that the state failed to prove beyond a reasonable doubt that his actions were the cause of the victim's death. We disagree, however, because the evidence was clearly sufficient to authorize the jury to find that Elliott's beating of the victim "directly and materially contributed to the happening of a subsequent accruing immediate cause of death." *James v. State*, 250 Ga. 655 (300 SE2d 492) (1983); *Larkin v. State*, 247 Ga. 586 (1) (278 SE2d 365) (1981); *Ward v. State*, 238 Ga. 367, 369 (233 SE2d 175) (1977). Moreover, we find no merit to this enumeration of error, since, viewing the evidence in a light most favorable to the jury's verdict, we find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. a. In his first enumeration of error Elliott argues that the trial court erred in denying his request for the court to appoint him different legal representation.

On August 8, 1983, the state was ready to proceed to trial; however, Elliott stated that he did not want the public defender assigned to his case to represent him because he felt that she was not acting in his best interests, and that he wanted counsel appointed who would act in his best interests. The public defender stated that she had investigated Elliott's case, was willing to discuss his case with him, and was ready to proceed, but that Elliott refused to cooperate with her. She also indicated that Elliott had told her and the Public Defender that he did not want any assistance from the Public Defender's office. The court informed Elliott that he did not have a right to appointed counsel of his own choosing, and stated that he hoped Elliott would reconsider his decision not to allow the assistant public defender to represent him. Elliott indicated he would represent himself, and the court granted his motion to continue the case so that he could prepare for trial.

At a motion hearing on August 23, 1983, Elliott stated that he wanted the public defender assigned to his case to be his lead counsel, while he would act as co-counsel. The trial court then notified the defense that the case was set for trial on September 6, 1983, but that

he would continue it if necessary. The public defender announced she would be ready at that time. The record reflects the public defender then privately discussed the case with Elliott, and thereafter stated to the court that she had discussed elements of the defendant's case with him, that he seemed to have more confidence in her representation, and that she would proceed as lead counsel. On September 7, 1983, the case proceeded to trial, with no objection from Elliott as to his representation by the public defender.

A defendant is entitled to reasonably effective assistance of counsel but not appointed counsel of his own choosing. *Kesler v. State*, 249 Ga. 462 (12) (291 SE2d 497) (1982); *Rivers v. State*, 250 Ga. 303 (6) (298 SE2d 1) (1982). Here, "[t]here is no indication in the record before us that the defendant's [appointed counsel] . . . [was] unable or unwilling to effectively represent the defendant," *Rivers v. State*, supra, 250 Ga. at 308; in fact, the contrary appears from the record. In addition, although Elliott initially expressed an unwillingness to let the public defender assigned to his case represent him, the record shows that Elliott ultimately agreed to being represented by her. For these reasons, we find no merit to Elliott's contention that the trial court erred in not appointing him different legal representation. Id.

b. In a pro se brief supplementing his counsel's brief, Elliott argues that he received ineffective assistance of counsel at trial. This claim, however, apparently was not made in the trial court, and we thus decline to address the merits of this claim at the present time. *Williams v. State*, 251 Ga. 749 (20) (312 SE2d 40) (1983); *Brown v. State*, 251 Ga. 598 (3) (308 SE2d 182) (1983); *Simpson v. State*, 250 Ga. 365 (2) (297 SE2d 288) (1982).

3. In his second enumeration of error Elliott argues that the trial court erred in admitting, over his objection, a certified copy of a simple battery warrant taken out by the victim against him. Elliott contends that the warrant was inadmissible because it improperly placed his character in issue and was not properly authenticated.

We find no error. "We have often held that evidence of prior difficulties between an accused and the victim is admissible to illustrate the accused's motive, intent, or bent of mind toward the victim. [Cites.]" *Hales v. State*, 250 Ga. 112 (2) (296 SE2d 577) (1982). Following this rule in *Williams v. State*, 250 Ga. 553 (2) (300 SE2d 301) (1983), we held that a peace warrant taken out by the murder victim against the defendant was admissible in evidence. Accordingly, the arrest warrant was properly admitted over Elliott's objection that it improperly placed his character in issue. In addition, the trial court properly admitted the certified copy of the arrest warrant over Elliott's objection that it was not properly authenticated. OCGA § 24-7-21; *Locklear v. State*, 131 Ga. App. 536 (6) (206 SE2d 527) (1974).

4. In his third enumeration of error Elliott argues that the trial

court erred in failing to give his requested charges on involuntary and voluntary manslaughter.

Elliott contends that he was entitled to a charge on unlawful act-involuntary manslaughter, see OCGA § 16-5-3 (a), in that there was slight evidence that he caused the death of the victim without any intention to do so, while in the commission of an unlawful act other than a felony, a simple battery. We disagree. Elliott offered no evidence concerning intent, whereas the state offered testimony that Elliott told the victim, while he was beating her, that he was going to kill her. Moreover, several witnesses testified that Elliott told them after the beating that the victim deserved to die. We thus cannot conclude that there was even slight evidence that the victim was killed without any intention to do so. Therefore, the trial court did not err by refusing to charge on involuntary manslaughter. OCGA § 16-5-3 (a); *Lancaster v. State*, 250 Ga. 871 (3) (301 SE2d 882) (1983).

Similarly, Elliott's contention that the trial court erred in failing to charge on voluntary manslaughter is meritless as there is no evidence in the record that the defendant acted "solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a); *Brooks v. State*, 249 Ga. 583 (1) (292 SE2d 694) (1982); *Giles v. State*, 253 Ga. 144 (4) (317 SE2d 527) (1984); *Denson v. State*, 253 Ga. 93 (1) (316 SE2d 469) (1984).

5. In his fourth enumeration of error Elliott contends that the trial court erred in denying the motion for mistrial which he made after several jurors inadvertently saw him in handcuffs.

During the jury's deliberations the court recessed proceedings from one afternoon until the following morning. After court reconvened the next morning Elliott made a motion for mistrial in which he alleged that the preceding day several jurors saw him as he was leaving the courthouse in handcuffs. After hearing the motion the trial court stated that he would hear the jury's verdict and then poll them to discover if the verdict had been affected by the incident. After the guilty verdict was returned, the court asked each juror whether they had seen the defendant in handcuffs; if they had, whether that affected their verdict, and whether they discussed the incident with any of the other jurors; and if they had not seen the defendant in handcuffs, had anyone told them of or discussed the incident with them. Four jurors stated that they had seen Elliott in handcuffs, but that they had not discussed the incident with anyone and that it had not affected their verdict. The jurors who had not seen the defendant stated that no one discussed the incident with them.

Because, during the transportation of Elliott, a prisoner, it was "natural for the police to have him handcuffed for security reasons,

and the jury would not have been shocked to see it," *Gates v. State,* 244 Ga. 587 (2) (261 SE2d 349) (1979), and because each of the jurors who inadvertently saw the defendant in handcuffs stated that they neither discussed the incident with any other juror nor allowed it to affect their decision, we find that the trial court did not abuse its discretion in denying Elliott's motion for mistrial. *Gates v. State,* supra; *Darling v. State,* 248 Ga. 485 (5) (284 SE2d 260) (1981); *Morris v. State,* 228 Ga. 39 (18) (184 SE2d 82) (1971), cert. den. 405 U. S. 1050.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 26, 1984 —
REHEARING DENIED OCTOBER 16, 1984.

*Amy Jean Griffith,* for appellant.
William Henry Elliott, *pro se.*
*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Assistant District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr.,* for appellee.