42091, 42092. MOORE v. THE STATE (two cases).

(330 SE2d 717)

WELTNER, Justice.

Michael Moore was convicted of murdering Mrs. Rebecca Hagan Futch by striking her with a baseball bat and stabbing her with a kitchen knife.[1] The state sought, unsuccessfully, the death penalty, and Moore was sentenced to life imprisonment.

---

[1] The sentencing verdict was returned and the sentence of life imprisonment was filed on June 2, 1984. The motion for new trial was filed on June 22, 1984, amended on October 24, 1984, and denied on January 14, 1985. Two notices of appeal were filed on February 12, 1985. The appeal was docketed in this court on March 8, 1985, and submitted for decision on April 19, 1985.

Mrs. Futch lived with Sheri Futch and Johnny Mobley, two of her children, in Claxton, Georgia. Another daughter, Cathy Odom, lived nearby. Contrary to her mother's wishes, 17-year-old Sheri had maintained social company with Moore, a high school senior and athlete, for approximately one and a half years. Sheri became pregnant by Moore. She had an abortion in December 1983, and became pregnant again by him in February 1984. Sheri and her mother quarreled about the use of monthly Social Security payments, and about substantial department store and telephone bills incurred by Sheri. As a result, Sheri stayed at Cathy Odom's house for two weeks during January 1984, and spent January 29th through the 31st with Laura Jones, a friend and neighbor.

Shortly after 5:00 p.m. on February 1, 1984, Mrs. Futch was observed leaving work, and, later, entering her home. A friend came by her house at 5:30 p.m., and observed Mrs. Futch's automobile parked in the driveway, but found the house locked. Unable to receive a response at the door, she returned home and telephoned Mrs. Futch, but there was no answer.

Wayne Barrow, a neighbor, testified that at 6:20 p.m. Sheri came to his house. She stated that after arriving at home she found a knife and blood on the dining room floor, and was afraid that something had happened to her mother. Barrow went to the house and found Mrs. Futch lying on the bed, beaten and stabbed. He called the police. When the neighbor told Sheri that her mother was dead, Sheri replied, "What have I done? I don't understand."

Emergency medical personnel, Claxton Police and Evans County Sheriff's deputies arrived to find Mrs. Futch dead. She was lying on her back in bed, partially covered by bedclothing. The investigating officers found a butcher knife in the dining room, a rag in the hallway, and a baseball bat in the bedroom — all covered with blood. Blood drops and smears led from the hallway into the bedroom, and blood splatterings were found on the bed, the bedroom wall, and floor. Bloody footprints were found next to the bed, on the bed sheets, and on the bat. Additional footprints were found in the dirt behind the house, which were consistent with a running stride.

Mrs. Futch's purse and keys were found on the dining room table, along with a note from Sheri advising that she had gone to Laura Jones' house. There were no signs of forced entry into the house.

Cathy Odom and Johnny Mobley determined that $40 and two rings belonging to their mother were missing. The rings ordinarily were kept on a partition between the living room and dining room.

Dr. Larry Howard of the State Crime Laboratory identified as the direct cause of death two stab wounds to the chest. In one instance, the fatal instrument had penetrated the heart. The victim also sustained five lacerations to the head and five cuts on the neck. How-

ard testified that the head wounds had required considerable force, and that strength was required to drive the knife through the victim's sternum. He concluded from an examination of the crime scene, the blood splatterings, and the victim's injuries, that Mrs. Futch was struck in the head with a blunt object in the hallway, was dragged face down into the bedroom, placed upon the bed, and cut in the neck and stabbed in the chest.

Police questioned Moore at his home on February 1, 1984, at approximately 9:30 p.m. They recovered from his bedroom a pair of white tennis shoes which Moore admitted he had worn earlier that day. The shoes had red stains on their tops, bottoms, and sides. Moore told the police that he had given the pants he wore earlier that day to Bernard Mincey. When the investigators recovered the pants from Mincey, one leg was rolled up, thereby concealing blood stains. A $20 bill was found in a pocket.

State Crime Laboratory officials testified that footprints in the hallway and backyard, and on the bed sheet and bat, all were similar in tread size, tread design and tread wear, and that they matched Moore's white tennis shoes; that the bloodstains on Moore's pants came from droplets, not smears, and matched the victim's blood, but not Moore's blood or the blood of one Isell Breuson. (Moore told the police that the blood on his pants was that of Isell Breuson, a fellow student, who had cut his finger at school that day.) A State Crime Laboratory serologist testified that Moore's white tennis shoes had been washed, but the red substance on them was blood; and that the blood on the knife, bat, and rag was the same type as the victim's.

A State Crime Laboratory microanalyst testified that hairs found on top of Moore's shoes were similar to the victim's hair.

No blood was found on Sheri Futch's clothing, and her shoes did not match the bloody prints found on the bedroom floor.

Moore's statement was introduced after a *Jackson-Denno* hearing. He stated that Sheri Futch called him at 3:45 p.m. on February 1, 1984, and said she would see him at school the next day; that he played basketball with friends at two separate locations between 4:00 p.m. and 6:00 p.m.; that he went to his brother's house to change pants then rode around Glenville until 9:00 p.m.; that Sheri called him at 9:15 p.m. to tell him that her mother committed suicide; that he knew nothing of the killing; and that the blood on his pants came from a fellow student who cut his finger at school that day. He also said he had been in the Futch residence only once.

Sarah Smith testified that between 4:00 p.m. and 4:30 p.m. she gave Moore a ride from Hagan to Claxton; that at Moore's instructions she circled the block where the victim lived and drove past the house one or two blocks; that he complained about the presence of traffic on the street; that he left the automobile and walked down the

street toward the Futch house, instructing Smith not to tell anyone about these events.

Timothy Petreat testified that he saw Moore walking near the Futch home at 5:25 p.m. in a quick, nervous manner. Bernard Mincey and Greg Johnson testified that Moore came to the playground to play basketball at some time after 5:00 p.m.; that they later rode to Moore's brother's house to get Moore another pair of pants, then rode to Glenville; that on the way to Glenville, Moore changed into another pair of pants, and tried to throw his other pants out of the automobile; that Johnson took the pants and gave them to Mincey; that Moore asked Mincey to wash them and gave Mincey a $20 bill and two rings; that Mincey gave the rings back to Moore but kept the $20 bill. Mincey testified that he saw red stains on Moore's shoes. Jhonda Sharpe testified that she saw red stains on Moore's shoes at 7:15 p.m.

Sheri Futch testified that she came home from school, then left to call Moore at about 3:35 p.m., returning home at 3:50 p.m. She testified that at 4:50 p.m. she left a note for her mother stating that she was going to Laura Jones' house; that she locked the house and went to Laura Jones' house to retrieve her clothes, as she was planning to spend that night at home.

Laura Jones testified that Sheri came to her house at approximately 5:10 p.m. Sheri, Laura Jones and Fran McRae then left Laura Jones' house at 5:30 p.m. to visit a friend. Fran McRae drove Sheri home at 6:30 p.m.

Sheri testified that when she arrived home, she saw the knife and blood in the hallway and ran to Wayne Barrow's house for help; that she did not say to Barrow, "What have I done?"; that she did not harm her mother in any way; and that she and Moore had not been at her mother's home earlier that day. Sheri denied that she and Moore conspired to kill her mother, and denied that she admitted Moore to the house that afternoon. She denied having made any statement to Cathy Odom in reference to the Social Security checks.

At trial, Moore testified that Sheri called him and asked him to come to her house so both could tell Mrs. Futch about Sheri's second pregnancy. He admitted that Sarah Smith gave him a ride to the victim's house at 4:10 p.m. He testified that Mrs. Futch was not at home, and that he and Sheri had intercourse in Sheri's bedroom; that he left at approximately 4:45 p.m. and walked to a nearby store to wait for Mrs. Futch to come home; that when he saw Mrs. Futch drive by, he waited a few minutes and then walked to her home; that when he arrived, Sheri was standing in the dining room holding a knife, and Mrs. Futch was lying in the hallway, beaten and stabbed. Moore then admitted dragging the victim into her bedroom and placing her upon the bed. He testified that Sheri took $40 from her mother's purse and two rings from the dining room partition and put them in his pocket;

that Sheri left by the front door and he by the back door. He denied that he stabbed, beat, or harmed Mrs. Futch, or that he conspired to harm Mrs. Futch, or had any prior knowledge of any plan to harm her. He admitted that he noticed bloodstains on his pants leg, first rolled the pants leg up, and then changed pants and gave the blood-stained pants to Mincey to wash. He denied that he had washed his shoes. He testified that he threw the victim's rings away.

The jury heard testimony that Carlton Phoenix, a Liberty County jail inmate, reported to law enforcement officers that Moore told him (Phoenix) that he (Moore) beat and stabbed Mrs. Futch. At trial, Phoenix denied that he had made such a statement.

1. The evidence is sufficient to support the verdict. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *White v. State*, 253 Ga. 106 (317 SE2d 196) (1984).

2. Moore contends that he was denied his right to a jury comprised of a fair cross-section of the community because, during voir dire, the state sought to remove all black veniremen from the trial jury, either by *Witherspoon* challenges or by peremptory strikes.

(a) As the jury imposed a life sentence, we need not consider any issues related to jury qualifications.[2]

(b) Moore has shown only that no black citizens served on his trial jury. He has failed to establish a systematic exclusion of black jurors, leading to a general condition that black citizens do not serve on criminal trial juries in the circuit. *Blackwell v. State*, 248 Ga. 138 (1) (281 SE2d 599) (1981). Accordingly, the presumption that a public officer's conduct was proper remains unrebutted.

3. Moore contends that his conviction was obtained through knowing use by the prosecution of the perjured testimony of Sheri Futch. He insists that the conviction must be set aside, because there is reasonable likelihood that the alleged false testimony could have affected the judgment of the jury. He also contends that the state failed to provide to him a report indicating that Sheri's fingerprints were found on items in her mother's purse. *United States v. Agurs*, 427 U. S. 97 (96 SC 2392, 49 LE2d 342) (1976).

(a) The transcript does not support Moore's contention that

---

[2] The jurors were qualified based upon whether they would *automatically* vote against the death penalty regardless of the evidence and the court's instructions. *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). "We have formerly recognized this as the standard for excusing a prospective juror for opposition to capital punishment. It is now clear, however, that the oft-cited footnote no longer holds. The standard for disqualification now is 'whether the juror's views [on capital punishment] would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *Alderman v. State*, 254 Ga. 206 (327 SE2d 168) (1985), quoting from *Wainwright v. Witt*, 469 U. S. ___ (105 SC 844, 83 LE2d 841) (1985). Notwithstanding, we conclude from application of the new standard that the trial court did not err in excusing any juror. *Wainwright*, supra.

Sheri Futch's fingerprints were found on items in her mother's pocketbook.

(b) The presence of hair in Sheri's bed and of hair on Moore's clothing does not establish that Sheri testified falsely that she was not present with Moore in her mother's house at or near the time of the homicide — there being no evidence as to when the bedclothes may have been washed or changed, or as to when Moore's clothing may have been washed.

(c) The somewhat confused information given to the police by 12-year-old Mathew Barrow did not suffice to establish that Sheri was at the crime scene — contrary to her testimony and the testimony of witnesses that she was elsewhere during the critical time. The defense did not call Barrow to the stand (although he was in court under subpoena), apparently because the child's version of the events was less than clear.

(d) Although Moore stated that Sheri was at the scene with a bloody knife in her hand, his testimony as to Sheri's presence was directly contradicted by her, and by other witnesses. Moreover, Moore's testimony contradicted his previous statements in many particulars. Witnesses established not only his presence at the scene but his attempts to dispose of, or to clean, his bloody clothing, and to rid himself of the victim's money and rings.

(e) The district attorney's remarks during closing argument[3] when taken in context indicate only his opinion that Sheri's testimony was truthful, but perhaps not *complete.* This enumeration of error is rejected.

4. Moore contends that the trial court denied him due process by (a) denying his motion to continue the hearing on the motion for new trial, (b) quashing subpoenas to obtain testimony of witnesses for use during the motion for new trial, and (c) denying his motion to be present during the hearing on the motion for new trial.

(a) Moore's motion for new trial was filed on June 22, 1984. On August 2, 1984, lead counsel moved to allow George E. Hairston to appear *pro hac vice* to assist the defense. The motion was granted on September 20, 1984. The transcript was filed on September 25, 1984, and on October 1, 1984, an order was entered setting the hearing on the motion for new trial for October 30, 1984. The court extended the time for amending the motion for new trial to October 24, 1984. On October 19, 1984, the motion for continuance was filed on the ground

---

[3] Moore relies upon these statements: "The defense, I'm sure, will say Sheri has not told you the entire truth, and I think that's probably right. *** There is a question and there may still be a question in your mind whether or not Sheri Futch is involved in this case. I do not know. The GBI thinks she is and they will continue to work on this case and collect evidence, if there is evidence, until they make a determination."

that Mr. Hairston had not received a copy of the transcript of proceedings until October 16, 1984. Lead counsel for the defense had been provided a copy of the transcript on October 3, 1984. The motion was addressed to the sound discretion of the trial court. We find no abuse in its denial. *Shouse v. State*, 231 Ga. 716, 720 (16) (203 SE2d 537) (1974).

(b) Moore sought to subpoena certain of the state's experts and Sheri Futch to testify at the hearing held on his motion for new trial. These subpoenas were quashed. The fingerprint expert appeared voluntarily during the hearing and was examined. Hence, the only question remaining is whether the other two subpoenas should have been quashed.

Moore asserts that the presence of certain hairs in Sheri's bedclothes and on his clothing necessarily proves that he and Sheri had been together at her mother's house immediately before the homicide. Further testimony from the hair analysis expert was sought on the motion for new trial. This matter was explored thoroughly by both sides during trial. Moore has made no attempt to satisfy the criteria for introduction of newly-discovered evidence. *Timberlake v. State*, 246 Ga. 488 (1) (271 SE2d 792) (1980).

The attempt to recall Sheri Futch apparently was in the hope that she might be induced to admit that she, rather than Moore, had stabbed her mother to death. Even so, such evidence would be impeaching only, and would not have supported the motion for new trial. *Drake v. State* 248 Ga. 891 (1) (287 SE2d 180) (1982); *Timberlake v. State*, supra. We find no error in the quashing of the subpoenas.

(c) A criminal defendant who is not laboring under the penalty of death has no right to be present during the hearing held upon his motion for new trial. See *Brown v. State*, 250 Ga. 66 (7) (295 SE2d 727) (1982); *Dobbs v. State*, 245 Ga. 208 (2) (264 SE2d 18) (1980).

5. Moore contends that the court erred by permitting the state to introduce "irrelevant and illegal hearsay testimony without proper foundation" through the guise of impeaching Carlton Phoenix, a witness called by the state.

Moore made no contemporaneous objection on this or any similar ground. The state had furnished Moore with a transcript of Phoenix' taped statement during which Phoenix, Moore's cellmate, had told the police that Moore had admitted killing the victim. When Phoenix took the stand, he denied that Moore had admitted any involvement, and testified that the police had provided him with a script, which he read during the taping. In return, he said, he expected to receive favorable treatment. The court then permitted the state to impeach Phoenix and to introduce his original statement. We find no error, *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982), "even if the

prosecution was aware of the prospect of changed testimony." *Burney v. State,* 252 Ga. 25, 26 (310 SE2d 899) (1984).

6. We decline to review at this time Moore's claim of ineffective assistance of counsel, as it was raised initially on appeal rather than in the trial court. *Elliott v. State,* 253 Ga. 417, 420 (320 SE2d 361) (1984).

7. Moore contends that the court should have charged on lesser included offenses, although he does not specify which lesser included offenses should have been charged. The defense did not request a charge on any lesser included offense at any time. *State v. Stonaker,* 236 Ga. 1 (222 SE2d 354) (1976). Further, the evidence would not support a charge on any lesser included offense. *Duncan v. State,* 252 Ga. 255 (3) (312 SE2d 805) (1984). We find no error.

8. Moore contends that the trial court erred by charging the jury relative to flight, parties to the crime, and impeachment of witnesses.

(a) A charge on flight may be appropriate although the defendant neither leaves the jurisdiction nor actively evades police investigators. *Prince v. State,* 252 Ga. 82 (7) (311 SE2d 433) (1984).

(b) Moore's own testimony that Sheri stabbed her mother and that he dragged the body to the bed and concealed his and her involvement was sufficient to authorize a charge on parties to the crime. Additionally, the jury heard evidence that there had been no forced entry into the house, which earlier that day had been locked, and that Moore had admitted to Phoenix both his and Sheri's involvement in the homicide. We find no error. *Rogers v. State,* 251 Ga. 408 (306 SE2d 652) (1983); *Owens v. State,* 251 Ga. 313 (305 SE2d 102) (1983).

(c) The charge as to impeachment of witnesses was correct and adjusted to the evidence.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 19, 1985 —
REHEARING DENIED JULY 2, 1985.

*Jack E. Carney, Jr., Franklin N. Biggins, Grover Hankins, George E. Hairston,* for appellant.

*Dupont K. Cheney, District Attorney, Michael J. Bowers, Attorney General,* for appellee.