## S90A1057. RENNER v. THE STATE.
### (397 SE2d 683)

HUNT, Justice.

Charles Frederick Renner II was tried before a jury and convicted of malice murder, felony murder, and armed robbery. The district attorney sought the death penalty, but Renner was sentenced to life in prison for murder and given a consecutive life sentence for armed robbery.[1] Defendant appeals, enumerating seven errors. We affirm.

The victim, Morris Garrett, was a 75-year-old man who owned and rented several trailers in Conyers. He was known to keep large sums of money on his person, and, because he had been robbed before, he was very careful about whom he allowed into his trailer. The defendant came to Georgia from Arizona in November of 1988 to live with Mark Schoolcraft, a friend from the Navy. They rented a mobile home from the victim in the same trailer park. Defendant befriended the victim and would often go to his trailer to watch wrestling on television with him.

---

[1] The crimes were committed on February 16, 1989, and Renner was indicted on May 3, 1989. He was tried commencing on September 19, 1990 and convicted on September 23. He filed his motion for a new trial on October 3, 1990. The trial transcript was certified on January 27, 1990, and on February 22, 1990, his motion for new trial was denied. His notice of appeal was filed on February 27, 1990, and was docketed in this court on April 4, 1990. The case was argued before the court on June 26, 1990.

Sometime late in the evening of February 16, 1989, Morris Garrett was garroted from behind, then simultaneously struck three times over the head with a heavy blunt object, causing his death. The next day, the victim's body was discovered by his step-daughter, face down on the floor in the living room of his trailer in front of his favorite chair.

Crime scene technicians theorized that the defendant returned the next morning to search for the victim's "wad" of money because it appeared that the victim was not thrown from the chair to the floor until several hours after he died. The victim's pockets were turned out and his rent-money box was found empty. Also discovered missing were a .22 caliber rifle, a .38 caliber pistol, and a wooden statue which may have been the bludgeoning instrument. The police did find close to $6,000 in a jacket pocket in the bedroom closet, which was consistent with the "wad" the victim normally kept. There was no evidence of forced entry or struggle.

The night of the murder, defendant's truck was not seen at his residence, nor was it there the next morning. Around 4:00 a.m., the morning after the murder, defendant went to Schoolcraft's parents' home, where Schoolcraft was staying. He informed Schoolcraft and his mother that he was leaving that day to return to Arizona. At about 5:00 a.m., defendant drove Schoolcraft to his job as a security guard.

Renner originally denied to investigators that he went to the victim's trailer the morning after the murder. However, at trial, on direct examination, defendant admitted he went to the victim's trailer in order to pay rent. Defendant testified that he rang the buzzer on the victim's intercom and when nobody answered, he left. However, a neighbor who saw defendant's truck at the scene that morning, testified that he did not see anyone around the truck or trailer. Later that morning, defendant picked up his final paycheck from the temporary employment agency for which he worked and informed them he was going back to Arizona. He cashed his check and picked up Schoolcraft from work. He and Schoolcraft replaced a broken headlight on his truck, and he left for Arizona.

Later that weekend, Schoolcraft's father found a tee shirt in the garbage can of their residence along with an old headlight. The tee shirt, later identified as belonging to defendant, had small blood stains on it. Experts identified the blood on defendant's tee shirt to be the same type as the victim's. A hair matching defendant's was found on the tee shirt along with a fiber which matched fibers from the chair in which the victim was killed.

The police then went to Phoenix, Arizona, to search defendant's parents' residence, where they found $1,000 (10 one-hundred dollar bills, one of which had a Stockbridge, Ga., bank stamp on it) hidden

under a couch cushion. Defendant claimed this was emergency money given to him by his mother before he left for Georgia, and that he occasionally dipped into it but always replaced it. However, a net worth analysis performed by one of the investigators showed the defendant appeared to be over $700 in debt when he left Georgia.

1. Having reviewed the evidence in the light most favorable to the jury's determination, we conclude that a rational trier of fact could have found the defendant guilty of murder and armed robbery beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Crawford v. State*, 245 Ga. 89, 90 (263 SE2d 131) (1980).

2. Defendant contends that the trial court erred in not allowing defense counsel to question police officers concerning information received about other suspects during the steps of their investigation. OCGA § 24-3-2; *Momon v. State*, 249 Ga. 865, 867 (294 SE2d 482) (1982); *Teague v. State*, 252 Ga. 534 (1) (314 SE2d 910) (1984).

Defense counsel sought to elicit evidence from several sheriff's deputies concerning the investigation of other suspects. The trial court allowed counsel to ask the officers whom they interviewed as suspects, but refused to allow inquiries into the contents of their conversations with those individuals. The court ruled that there was no reason for the officers to have to explain their actions by giving information secured from third parties. In *Teague*, this court held that rarely will the "conduct" of an investigating officer need to be "explained," as in practically every case, the motive, intent or state of mind of such an officer will not be "matters concerning which the truth must be found." The hearsay rule, OCGA § 24-3-2, must be kept within its limits to avoid the admission of "rumor, gossip, or speculation." *Teague v. State*, supra, 252 Ga. at 536. Furthermore, the defendant subpoenaed one of the suspects to testify at trial.

The trial court properly excluded this testimony and this enumeration is, therefore, without merit.

3. (a) The trial court's jury charge on flight, derived from the pattern charges, was not error. But see Division 3 (b), infra. The evidence authorized a finding by the jury that Renner's departure from this state following Garrett's death was occasioned by a consciousness of guilt. That the evidence would have authorized a different finding does not render the charge inappropriate. We disagree with the position of the dissent that flight *must* involve concealment or that the court's charge on flight, viewed in the context of the overall charge, requires a reversal in this case.

(b) The fact that a suspect flees the scene of a crime points to the question of guilt in a circumstantial manner. Whether it is fair for a trial court to identify and explain the possible consequence of one circumstance, such as flight, and not others, which might even point

to innocence, is a matter which has been debated by the members of this court on more than one occasion. *Cameron v. State*, 256 Ga. 225, 227 (345 SE2d 575) (1986) (Bell, J., with Weltner and Hunt, JJ., concurring). *Griffin v. State*, 257 Ga. 148, 150 (356 SE2d 209) (1987) (Bell, J., dissenting); *Duke v. State*, 256 Ga. 671, 673 (352 SE2d 561) (1987) (reversed on other grounds, but holding the flight charge was not authorized by the evidence). As Justice Bell said in his concurrence in *Cameron*, supra at pp. 227-228:

> I would abolish the jury instruction on flight in criminal cases. The charge serves no real purpose, as it is a particularization of the general charge on circumstantial evidence, and as the state is free to use circumstantial evidence of flight to argue the defendant's guilt. . . . Moreover, the charge inevitably carries with it the potential of being interpreted by the jury as an intimation of opinion by the court that there is evidence of flight and that the circumstances of flight imply the guilt of the defendant; this is especially true since the trial court does not give specific charges on other circumstances from which guilt or innocence may be inferred.

Today, we adopt such a rule. Hereafter,[2] while the state may offer evidence of and argue flight, it shall be error for a trial court in a criminal case to charge the jury on flight.

4. In his fourth enumeration, defendant contends there was insufficient evidence to warrant a charge on parties to a crime. The evidence presented and the testimony of the experts tended to show that two people killed the victim. Defendant testified on cross-examination that he had discussions with Mark Schoolcraft on how to rob the victim, and another witness testified that he had taught Schoolcraft the garroting technique which was used in the murder. In the early morning after the murder, defendant drove Schoolcraft to his job as a security guard. A co-worker testified that Schoolcraft was acting unusual, was extremely pale, and appeared to be scared. From this evidence, a jury could have convicted the defendant as a party to the crime. See OCGA § 16-2-20; *Moore v. State*, 254 Ga. 525 (8) (330 SE2d 717) (1985). The fact that Schoolcraft was tried a week later and acquitted has no bearing on the present case. *Eades v. State*, 232 Ga. 735 (4) (208 SE2d 791) (1974).

5. Defendant contends the trial court erred in failing to instruct the jury to choose between malice murder and felony murder. This identical issue was presented before this court in *Smith v. State*, 258

---

[2] That is, cases tried after the date on which this opinion appears in the advance sheets of the Georgia Reports, 260 Ga. 515 (January 10, 1991).

Ga. 181 (366 SE2d 763) (1988). In *Smith,* the defendant was also convicted of both malice murder and felony murder, and this court held that "[w]hen the elements of malice and an underlying felony both exist in a murder case, the law does not preclude verdicts of guilty of both malice and felony murder." *Smith* at 183. See *Baty v. State,* 257 Ga. 371, 374 (359 SE2d 655) (1987); *Usher v. State,* 259 Ga. 835, 836 (1) (388 SE2d 686) (1990).

6. In his sixth enumeration, defendant contends the trial court erred in sentencing him for murder and armed robbery in that armed robbery was a lesser-included offense of murder. Where there is only a single victim, one may not be convicted of both the underlying felony and felony murder. *Stitt v. State,* 256 Ga. 155 (3) (345 SE2d 578) (1986).[3] However, in this case defendant was sentenced for malice murder,[4] not felony murder, *Smith v. State,* supra 258 Ga. at 182, and the sentence for armed robbery is authorized. *Dick v. State,* 246 Ga. 697 (7) (273 SE2d 124) (1980).

7. In his final enumeration, defendant contends the trial court erred in giving the jury the *Allen [v. United States,* 164 U. S. 492 (1896)] charge. Defendant argues the jury was neither hopelessly deadlocked nor deliberating for such a long period of time to justify such a charge. The trial court's decision to give the charge in this case was not error. *Anderson v. State,* 247 Ga. 397 (3) (276 SE2d 603) (1981).

Although we have approved only a modified *Allen* charge during the sentencing phase of a capital case, *Romine v. State,* 256 Ga. 521, 527 (350 SE2d 446) (1986); *Legare v. State,* 250 Ga. 875 (1) (302 SE2d 351) (1983), defendant's contention that it is error to give the customary *Allen* charge during the guilt or innocence phase of the trial is meritless.

*Judgment affirmed. All the Justices concur, except Clarke, C. J., and Smith, P. J., who dissent as to Division 3 (a) and the judgment.*

CLARKE, Chief Justice, dissenting.

I concur with the majority except as to Division 3 (a). To this division, I respectfully dissent.

In my view, the evidence in this case fails to support a charge on flight even under the present law.

---

[3] If by "conviction" one means the judgment or sentence pronounced by the court (but see Black's Law Dictionary, revised 4th ed., p. 403) then it is true that one may not be "convicted" for both felony murder and the underlying felony. However, a jury may return guilty verdicts as to each and if one is not *sentenced* for the felony murder (but for malice murder, for example) then one can be sentenced for the underlying felony.

[4] Renner's assertion that the trial court *may* have imposed sentence on the felony murder verdict is belied by the record. The written sentence clearly makes the distinction between the two offenses and sentence is imposed only on the malice murder count.

Black's Law Dictionary defines flight thusly:

"The evading of the course of justice by voluntarily withdrawing one's self in order to avoid arrest or detention, or the institution or continuance of criminal proceedings, regardless of whether one leaves jurisdiction."

I believe this Court should apply that definition in this case and hold that a charge on flight is not adjusted to the evidence unless the evidence demonstrates "evading the course of justice" by voluntary withdrawal to avoid arrest or detention, or continued concealment. In my view, evidence of any travel which fails to demonstrate an intent to conceal one's self from the authorities falls short of that which is required for a charge on flight even under existing law.

Here, Renner told his employer, his friend and his friend's parents where he was going. He then proceeded to go there. He ran but he did not hide.

The jury should not have been charged on flight.

I am authorized to state that Presiding Justice Smith joins in this dissent.

DECIDED NOVEMBER 7, 1990.

*Notte & Bianco, Guy J. Notte,* for appellant.
*Robert F. Mumford, District Attorney, Michael J. Bowers, Attorney General, Mary H. Hines,* for appellee.