## A00A0917. ADAMS v. THE STATE.
### (538 SE2d 508)

RUFFIN, Judge.

Sherman Adams was convicted of aggravated assault, possession of a firearm during the commission of a crime, possession of a sawed-off rifle, and obstruction of an officer. He appeals, contending that the evidence was insufficient to support the convictions and that the court erred in conducting a portion of the trial in his absence.

1. Viewed in the light most favorable to support the verdict, the evidence was as follows. About midnight on April 19, 1997, Saleh Grogan was walking across a bridge in Columbus when he heard two shots. Grogan ran and hid behind a car near some apartments on Martin Luther King Boulevard. Directly across the street from the apartments was the Marshall Middle School football field. Grogan saw a medium-built male dressed in black on a hill in the field, reloading a lever-action rifle. Grogan called out to the man, asking why he was shooting at him. The man walked toward Grogan, who started running toward the apartment building. The man shot Grogan in the back.

Grogan then knocked on the window of Rosie Butler's apartment, asking to be let in. When she said no, Grogan broke in through the window. Butler called the police and tried to control Grogan's bleeding while waiting for them to arrive.

Sandra Rigons, who lived in the same complex as Butler, corroborated many details of Grogan's testimony. She testified that, after hearing what sounded like a car backfiring, she looked out her win-

---

[21] *Hall v. State*, 210 Ga. App. 792, 794 (1) (437 SE2d 634) (1993).

dow and saw Grogan standing by the cars in the parking lot. According to Rigons, Grogan was talking to someone across Martin Luther King Boulevard, saying,"[W]hat's up, man[?] Why you doing this[?] Why you trippin' like this[?]" Rigons looked across the road and saw a male standing on a hill in the field, dressed in black pants, a white t-shirt, and black and white tennis shoes. This man pulled up what looked to Rigons like a shotgun and started shooting at Grogan. Rigons saw Grogan fall after being shot.

Officer Jackie Lee arrived at the scene and spoke with Grogan. Lee then advised Officer Kimberly Trumble that shots had been fired from the Marshall Middle School area. Trumble and other officers drove toward the school to search for the shooter. At the corner of Sheppard Drive and Seventeenth Avenue, they encountered a man, later identified as Adams, who told them he had heard shots and had seen someone running down Sheppard Drive. Officer Michael Green, who arrived on the scene as Trumble was talking to Adams, saw Adams pointing toward the middle school. Adams was wearing a black jacket and dark pants, and had grass in his hair and on his clothing. Officer Green performed a pat-down search and found two 30/30 caliber bullets in Adams' jacket pocket. Green then told Trumble to place handcuffs on Adams. Adams began struggling with the officers. He eventually broke free and ran down Sheppard Drive toward the Farley Homes apartments. Officer Torrence Goodwin saw Adams running across Nina Street near the apartments. After Adams unsuccessfully tried to jump over a fence, Goodwin drew his weapon and ordered Adams to put his hands in the air. Adams did so, and was taken into custody.

After Adams was arrested, Officer Trumble returned to the intersection of Sheppard Drive and Seventeenth Avenue where she had first seen him. She found a bag next to a telephone pole where Adams had been standing. Inside the bag was a sawed-off 30/30 lever-action rifle, along with 27 rounds of 30/30 caliber ammunition. In addition, there were a Blockbuster Video card and a food stamp card with Adams' name on them, as well as a receipt in the name of "S. Adams."

Officer Lee searched the hill from which the shots were supposedly fired, and found a 30/30 caliber shell casing on the ground. He explained that the shell casing would have been ejected from the rifle when it was recocked after firing.

Rigons saw Adams after he was arrested, and told police that he was wearing the same clothes as the man she had seen firing the shots. However, she said that she had not seen the man's face. At trial, she was shown the sawed-off rifle found in Adams' bag, and said that it could have been the weapon the man was firing, although she could not be sure because it was dark. Grogan testified that the

rifle looked like the one with which he was shot.

Although Adams points out that no eyewitness positively identified him as the shooter, the circumstantial evidence was sufficient for the jury to conclude that he was in fact the shooter. Adams was discovered shortly after the shooting, near the scene of the crime, at a time of night when few people would be out. His clothing matched that worn by the shooter. There was abundant evidence that the sawed-off rifle was his, since it was found where he had been standing, identifying information was discovered in the bag, and 30/30 caliber bullets were found both in the bag and on his person. A spent 30/30 caliber shell casing was found on the hill from which witnesses said shots were fired. The sawed-off rifle was a lever-action rifle, like the one Grogan described the shooter as having. The fact that Adams fled from police also constitutes circumstantial evidence of guilt.[1] Viewed in the light most favorable to support the verdict, the evidence was sufficient to authorize the jury to conclude that the only reasonable hypothesis was that Adams was the shooter.[2]

2. Adams argued that the evidence was insufficient to support his conviction for possession of a sawed-off rifle, asserting that there was no evidence the rifle had "a barrel . . . of less than 16 inches in length or . . . an overall length of less than 26 inches," as required by OCGA §§ 16-11-121 (4) and 16-11-122. He points to the fact that a prosecution witness, showing the rifle to the jury, testified that "[i]t's been a barrel open and sawed down and less than ten inches and the stock itself has been removed." Adams states that "[i]t is impossible to tell from the testimony of the officer what had been sawed down or what the overall length of the weapon was." However, the rifle itself was introduced into evidence for the jury to view, and the jury was properly charged as to the elements of the crime. Because the rifle has not been included in the record on appeal, we cannot say that the evidence was insufficient to support the conviction.[3]

3. Adams contends that the trial court erred in conducting a portion of the trial in his absence. During jury deliberations, the trial court asked the jury whether it had reached a verdict on any of the charges, and the foreman said that a verdict had been reached on some charges. The trial court then dismissed the jury for lunch. Although the trial transcript does not indicate that Adams was absent during this exchange, Adams testified at the motion for new

---

[1] See *Renner v. State*, 260 Ga. 515, 517 (3) (b) (397 SE2d 683) (1990); *Wilson v. State*, 230 Ga. App. 271, 272 (1) (495 SE2d 894) (1998).

[2] See *Murray v. State*, 271 Ga. 504, 505 (1) (521 SE2d 564) (1999) (reasonableness of hypothesis is generally question for jury).

[3] See *Morrissette v. State*, 229 Ga. App. 420, 425 (494 SE2d 8) (1997) (burden is on appellant to bring up all evidence, including physical evidence, necessary for consideration of issues on appeal).

trial hearing that he was not present. The judge, however, noting that he had taken detailed notes during the proceedings, found that Adams had in fact been present. Because this factual finding is not clearly erroneous, this enumeration is without merit.[4]

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED AUGUST 21, 2000.

*William J. Mason*, for appellant.

*J. Gray Conger, District Attorney, Roger H. Anderson, Assistant District Attorney*, for appellee.

---

[4] See *White v. State*, 221 Ga. App. 860, 862 (2) (473 SE2d 539) (1996) (trial court's findings of fact on motion for new trial will be upheld unless clearly erroneous).