308 Ga. 43
FINAL COPY

S19A1571.  NAPLES v. THE STATE.

BLACKWELL, Justice.

Michael Naples was tried by a Cherokee County jury and convicted of murder and other crimes in connection with the death of 17-month-old Kaylee Johnson. Naples appeals, contending that the trial court erred when it admitted "other acts" evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)") and that he was denied the effective assistance of counsel. Finding no reversible error, we affirm.[1]

---

[1] Kaylee died on October 16, 2012. In December 2013, a Cherokee County grand jury indicted Naples and Jamie Beck, charging them with murder in the commission of a felony (cruelty to children in the first degree), two counts of cruelty to children in the first degree, two counts of aggravated assault, and two counts of aggravated battery. Beck eventually pleaded guilty to lesser charges, and Naples was tried alone in April and May 2015. The jury found Naples guilty of felony murder, one count of cruelty to children in the first degree, cruelty to children in the second degree (as a lesser offense included in the other count of cruelty to children in the first degree), both counts of aggravated assault, and one count of aggravated battery. The jury acquitted Naples of the second count of aggravated battery. In June 2015, the trial court sentenced Naples to life in prison without parole for felony murder, a consecutive term of imprisonment for 20 years for aggravated battery, and a

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows that Jamie Beck and her two daughters — Kaylee and K.B. — went to Naples's house on October 13, 2012, and stayed overnight. Around 2:00 on the morning of October 14, Beck found Kaylee lying unresponsive at the bottom of the stairs leading to the basement. Beck called 911, and Kaylee was taken to the hospital, where she was found to have a skull fracture and inoperable brain swelling that led to her death. Subsequent investigation revealed that Naples caused the fatal injury to Kaylee, either by slamming her head against a hard object or throwing her down the stairs.

The State presented extensive testimony about the relationship between Naples and Beck, as well as the series of events that led up to Kaylee's death. This testimony shows that Naples and Beck began dating in the summer of 2012, while both were married

consecutive term of imprisonment for 10 years for cruelty to children in the second degree. The other counts merged. Naples timely filed a motion for new trial, but the trial court denied his motion in December 2018 after a hearing. Naples timely appealed, and this case was docketed to the August 2019 term of this Court and submitted for a decision on the briefs.

2

to other people. At that time, Beck was married to Nathan Johnson — the father of Kaylee and K.B. — but he was incarcerated. Naples then was married to Mandy Naples — his second wife with whom he had a seven-year-old son, G.N. — but Naples and Mandy were separated. Beck tried to conceal her relationship with Naples from her parents and other family members. Sometime in August or September 2012, Beck and her two daughters began staying at Naples's house periodically.

Kaylee was described as a "clingy" child who constantly sought attention from Beck, and Naples complained to Beck that she "held [Kaylee] too much." During the time that Naples and Beck were together, some of Beck's family noticed that Kaylee was bruised and had lost some hair, and they expressed concerns to Beck. Near the beginning of October 2012, Johnson was released from prison. Naples was jealous of Johnson and wanted Beck to divorce Johnson as quickly as possible. Only days before Kaylee's fatal injury, Naples told Beck that he "couldn't handle" Beck talking to Johnson, and Beck decided to break up with Naples.

3

On the morning of Saturday, October 13, Beck went to Naples's house to pick up her and the girls' belongings. While there, she joked with Naples that she wanted to hit him. He then started smacking her in the face and stomach (despite her telling him to stop), and he eventually pinned her on the bed while holding her hands. He told her to hit him, which she did, and he said, "There, you did it," and got off her. Beck was confused and "freak[ed] out" by this episode; she had not previously seen Naples behave in such a way. A short time later, as Beck was putting the girls' clothes in her car, Naples came out and called her a "liar and a slut" in front of G. N., and he also told G.N. to say goodbye to Beck and the girls because "he was never going to see [them] again." Despite Naples's behavior, Beck agreed to go with him and the children — Kaylee, K. B., and G. N. — that day on a prearranged trip to an apple festival in Ellijay, where they met up with some of Beck's relatives.[2] After the festival, Beck agreed to spend the night at Naples's house.

---

[2] Beck explained that she went to the apple festival with Naples because "I didn't want to fight anymore. . . . I didn't know what he would do if I didn't

Beck testified that the girls and G.N. went to bed around 8:00 or 9:00 p.m. Beck then took a shower for about 15 to 20 minutes, and when she walked out of the bathroom, she saw that the doors to the girls' bedroom and G. N.'s bedroom were closed. Beck went into the master bedroom without checking on the girls. Shortly afterward, Naples came into the bedroom and told Beck that she "was going to drink." Beck initially refused, but Naples insisted and poured her shots of tequila, which she drank while sitting on the floor in front of the bed. As Beck recounted, Naples "would pour the shots, and then he would put them up to my mouth to try and get me to . . . It was weird. It was very forceful." Beck and Naples then had sex and went to bed.

During the night, G. N. walked into their bedroom, complaining that he had a bad dream and heard something in his closet. Naples allowed G. N. to get into bed with them. Naples then again had sex with Beck, after which he asked her to get him some

go. I felt like I couldn't get away." Beck also admitted that she still cared about Naples at the time.

5

water. When Beck walked out of the master bedroom, she saw that the children's bedroom doors were open and that the girls were not in their room. She looked through the open basement door and saw Kaylee lying on the floor at the bottom of the stairs. Beck immediately went to Kaylee, picked her up, and carried her up the stairs. She called for Naples, and he came into the doorway just as Beck was about halfway up the stairs.[3] Kaylee appeared to be asleep but "wouldn't move." Emergency personnel were called, and Kaylee was taken to the hospital.

Kaylee was examined by several medical professionals, including a pediatrician who specialized in child abuse. These medical professionals testified that Kaylee's head injury was far more extensive than anything that could be expected from a child falling down the stairs. Moreover, Kaylee had other injuries, including bruises around her neck consistent with choking and

---

[3] Beck's testimony that Naples came into the doorway only *after* she picked up Kaylee was incriminating because Naples had described in detail to investigators the position of Kaylee's body at the bottom of the stairs.

small red spots on the back of her head indicating that hair had been yanked out. These injuries were inconsistent with a fall. X-rays also revealed a rib fracture that was in the healing phase and a newer fracture on her right leg. Several days after arriving at the hospital, Kaylee was declared brain dead and taken off life support.

Naples was arrested almost a year after Kaylee's death. While in jail, he became good friends with another inmate, David Matthews, who was a "jailhouse lawyer" of sorts. Naples sought advice from Matthews about his case and shared highly incriminating details about Kaylee's death. According to Matthews, Naples described the incident as follows. On the night in question, Naples and Beck had a fight. Naples pushed Beck up against a wall, and Beck stormed off and went to bed. Naples then became "very aggravated" because Beck had left him with the responsibility of putting the three children to bed. With Kaylee in his arms, Naples put K.B. to bed in the basement, where she sometimes slept. He then carried Kaylee back out of the basement, but encountered some trouble locking the child safety gate at the top of the stairs. Kaylee

7

was "fussy and tired" and "crying real loud in his ears," so Naples "reached over and covered her mouth with one of his hands, and then grabbed at her neck, like upper neck/chin area, and turned her head away, and then yelled at her [to] shut up." Naples then put Kaylee down to make it easier to shut the gate, but Kaylee started "kicking at him." At that point, Naples told Matthews, he "snapped" and "lost it." He picked up Kaylee and shook her, yelled at her, and threw her down the stairs, "like a toss." Naples watched Kaylee tumble down the stairs and hit her head on one of the steps before landing on the concrete floor. Because Kaylee was crying, Naples did not think she was "hurt too bad." So he went back to the bedroom to finish his argument with Beck, after which they had "rough make-up sex."

Matthews testified that Naples consulted him about "accident defenses, alibis, bent of mind, temporary insanity," and other defenses, and that Naples's "main focus was trying to find how he could make this seem like an accident." Referencing the nearly one-year delay between Kaylee's death and his arrest, Naples told Matthews that, after about six months, "I thought I'd got away with

8

it." Matthews also testified that Naples talked to him about attempts to hide the crime and the possibility of blaming Kaylee's death on Beck, G. N., or K. B. According to Matthews, Naples even considered hiding Kaylee's body in the woods.

Another inmate testified that Naples told him in jail that, on the night in question, Kaylee "was crying and getting on everybody's nerves," and when Naples tried to get her "away from the staircase . . . he accidentally knocked her down the stairs."

Naples testified in his own defense, asserting that he did nothing to harm Kaylee. On cross-examination, he also testified that he did not think that anyone else in the house hurt Kaylee. He said he did not know how Kaylee sustained a skull fracture or other injuries.[4]

---

[4] The State's theory of the case was that Naples repeatedly slammed Kaylee against a wall or some other hard object and then placed her at the bottom of the stairs to make it look like an accident. Supporting this theory was evidence of a small stain of Kaylee's blood on the wall in the bedroom where she slept. The State asked the jury to consider Naples's statements to Matthews only as evidence that he killed Kaylee (not how he did it) and that he tried to cover up the crime.

Naples does not dispute that the evidence is sufficient to sustain his convictions. But consistent with our usual practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence. We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Naples was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Naples argues that the trial court erred when it admitted other acts evidence under Rule 404 (b) that showed Naples's violent behavior toward his first wife (Amanda Tollefson), his daughter with his first wife (A. T.), his first wife's sister (Tracy Mason), his second wife (Mandy Naples), and his son with his second wife (G. N.). The trial court determined in a pretrial order that this evidence was relevant to show "intent and lack of mistake or accident."

(a) *Amanda Tollefson*. Naples and Tollefson were married for about two years, beginning in 2003. Tollefson testified that Naples

was physically abusive throughout their relationship: "he would hold my arms and shake me. He pushed me up against the wall. Numerous times I tried to go into a room to run away from him, and he would smash the door. He would smash me in between the door and the wall repeatedly. He's shoved me down." Tollefson further testified that Naples would take her by the throat with one hand and push her up against the wall, something that happened "[t]oo many times to count." Naples's abuse occurred when they were arguing about something, Tollefson recounted: "It always had to do with something about how I wasn't doing it the right way or if it wasn't how he wanted it — he expected it to be done." Once, during an argument on the side of the road, Naples grabbed her and started shaking her, and another time, while in the car, he slammed her head against the window. This last incident occurred when their daughter, A. T., was six weeks old, and Tollefson reported it to the police.

(b) *A.T.* Tollefson testified that, when A. T. was born, she had colic and cried a lot. Naples was irritated by A. T.'s crying. To stop

11

her from crying, Naples would "hold her jaw shut, blow in her face, he would hold her upside down by her legs and just swing her around. He would put blankets or pieces of clothing on top of her." According to Tollefson, Naples also called A. T. a "b*tch" and "told her to shut up." Once, Tollefson saw Naples holding A. T. beside the crib, shaking her, and saying, "shut up, you stupid b*tch. You've ruined my life."

Other evidence of A. T.'s abuse came from Danielle Naples, Naples's sister-in-law. Danielle testified that Naples was rough with A. T. He would pick her up over his head and shake her, even when she was very small. On one occasion, Danielle said, Naples blew in A. T.'s face to get her to stop crying, and another time, Naples put his hand over A. T.'s mouth, got close to her, and said, "Shut up, you stupid b*tch."

(c) *Tracy Mason*. Tollefson testified that, on one occasion, Naples "put his hand around [Mason's] neck and threatened her."

(d) *Mandy Naples*. Evidence about the abuse of Mandy came from Naples himself, who testified on cross-examination that his

12

relationship with her was "volatile," that they argued a lot, and that she had obtained protective orders against him. Naples testified that he pushed Mandy, hit her, and put his arm around her throat, but he stated that at least part of this conduct was just "play."

(e) *G. N.* Several witnesses testified about multiple instances in which Naples acted violently toward G. N. A case manager with the Division of Family and Children Services testified that she visited G. N.'s school to investigate a report of abuse and observed marks on G. N.'s face, which were consistent with a slap. G. N. told the case manager, among other things, that his father "spanks him for no reason" and that he got "slapped on the face the other day," though he said he was not afraid of his father.

Danny Lackey, Naples's friend and Beck's cousin, testified that Naples disciplined G. N. in a "pretty firm" way and ruled him with an "iron fist." Lackey explained that Naples would

> grab [G. N.] by the shirt and say, you better straighten your ass up or I'll straighten it up for you. Or, you know, if he had something in his hand, say a spoon or a spatula or whatever . . . he would pop him in the back of the head with whatever he had.

13

Lackey also testified that Naples would grab G. N. by the shirt and push him up against a wall, and he would speak to G. N. while angrily gritting his teeth. Naples also would pick up G. N. and "toss him on the couch," or "pick him up by the front or the back of the neck," and if G. N. was acting up, Naples would "squeeze the back of the neck real hard." Lackey testified that Naples often would grab G. N. by the neck or throat area, and when asked how G. N. would react to such grabbing, Lackey replied, "Sometimes it looked like that he was upset. Sometimes it was for fun. Sometimes I think [G. N.] went back and put on a good front, but you could tell he wasn't happy about it." Lackey described Naples's behavior toward G. N. as "borderline" and "a little tougher . . . than I would do as a parent." Lackey also testified that Naples went too far on one occasion, when, after G. N. refused to go to bed, Naples became "pissed off," picked him up, and bounced him on the couch.

Lackey's fiancée, Tonianne Comarato, testified that she saw Naples pick up G. N. by the throat "quite a few times," which

14

concerned her. She had seen Naples smack G. N. on the back of the head. And one night, she saw Naples throw G. N. "across the driveway." Comarato testified that G. N. often would cry when Naples did such things.

Danielle (Naples's sister-in-law) testified that Naples was "too rough" with G. N. On one occasion, when G. N. was about four years old, Naples picked him up by his jaw off the ground, "forcefully pinned him up against the wall and gritted his teeth and got in his face," and said "you better cut it out right now." Another time, Danielle saw Naples smack G. N. in the back of the head so hard that G. N. fell forward onto the floor. Danielle thought it was "way too rough."

Sonya Baisden, Mandy Naples's sister, testified that she saw Naples slap G. N. on the back of his head "just for doing things that he didn't approve of." Baisden also saw Naples pick up G. N. by the throat and hold him up against a wall.[5]

---

[5] Also admitted into evidence was the testimony of the director of a child advocacy center, who conducted two forensic interviews with G. N. in October

Rule 404 (b) provides, in relevant part:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

OCGA § 24-4-404 (b). This Court applies a three-part test to determine whether other acts evidence is admissible under Rule 404 (b): (1) the evidence must be relevant to an issue other than the defendant's character, (2) the evidence must satisfy the requirements of OCGA § 24-4-403 ("Rule 403"),[6] and (3) the State must offer sufficient proof for the jury to find that the defendant committed the act. See Bradshaw v. State, 296 Ga. 650, 656 (3) (769

---

2012. These interviews were recorded and played for the jury at trial. Naples asserts in his brief that those interviews contain allegations about Naples's physical abuse of G. N., but he provides no further details as to those allegations. A review of those interviews and the director's testimony reveals that they dealt with the events surrounding Kaylee's death, not Naples's abuse of G. N.

[6] Rule 403 provides: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

SE2d 892) (2015); State v. Jones, 297 Ga. 156, 159 (1) (773 SE2d 170) (2015). "A trial court's decision to admit other acts evidence will be overturned only where there is a clear abuse of discretion." Jones, 297 Ga. at 159 (1).

Naples argues that the other acts evidence described above was inadmissible to prove *identity* because his acts toward others were not at all similar to the crime committed against Kaylee. See Brooks v. State, 298 Ga. 722, 725 (2) (783 SE2d 895) (2016) ("When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused." (Citation and punctuation omitted.)). This argument fails, however, because the trial court admitted the other acts evidence not to prove identity, but to prove "intent and lack of mistake or accident." And to prove intent, the only similarity needed between the extrinsic acts and the charged offenses is the state of mind. See Bradshaw, 296 Ga. at 657 (3) ("Where the extrinsic offense is offered to prove intent, its relevance is determined by comparing the defendant's state of

17

mind in perpetrating both the extrinsic and charged offenses. Thus, where the state of mind required for the charged and extrinsic offenses is the same, the first prong of the Rule 404 (b) test is satisfied." (Citation and punctuation omitted)). See also Kirby v. State, 304 Ga. 472, 484 (4) (a) (i) (819 SE2d 468) (2018) ("When other act evidence is introduced to prove *intent* [as opposed to identity] a lesser degree of similarity between the charged crime and the extrinsic evidence is required." (Citation and punctuation omitted; emphasis in original)). So, even if Naples's violence toward others was not similar enough to his attack on Kaylee to be relevant to identity, this lack of similarity does not render the other acts evidence inadmissible for other legitimate purposes.

Naples further contends that the other acts evidence was inadmissible to prove *intent*, but his arguments in this regard are likewise unavailing, at least with respect to the abuse of the two children — G. N. and A. T.[7] To begin, the other acts evidence about

---

[7] It is a closer question as to whether the other acts evidence concerning the *adult* victims — Tollefson, Mandy, and Mason — was admissible to prove

G. N. and A. T. satisfies the first prong of the Rule 404 (b) test because this evidence was relevant to prove Naples's intent with regard to the charged crimes against Kaylee. We have stated that "[a] defendant who enters a not guilty plea makes intent a material issue," and the State may prove intent "by qualifying Rule 404 (b) evidence absent affirmative steps by the defendant to remove intent as an issue." Bradshaw, 296 Ga. at 656-657 (3) (citation and

intent under Rule 404 (b), and this is especially true as to Mason because, unlike with Tollefson or Mandy, there was no evidence that she had a close relationship with Naples and lived in his household. We need not decide this question, however, because even if the admission of the other-acts evidence concerning the three adult victims was erroneous, this error was harmless. See Rivera v. State, 295 Ga. 380, 382 (2) (761 SE2d 30) (2014) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted)). The admissible evidence against Naples was very strong — it included testimony from multiple health professionals that Kaylee's head injury was not accidental, testimony about Naples's numerous violent acts toward G.N. and A.T., and testimony from the two jailhouse informants. This evidence was coupled with the sheer implausibility of anyone in the house besides Naples having inflicted Kaylee's fatal injuries. So it is highly probable that the jury would have found Naples guilty of the crimes of which he was convicted in any event, even without evidence that Naples acted violently toward the three adults. See Harris v. State, 304 Ga. 276, 281 (4) (818 SE2d 530) (2018) (admission of other acts evidence, even if erroneous, was harmless given the "strong" evidence of defendant's guilt); Hood v. State, 299 Ga. 95, 105-106 (4) (786 SE2d 648) (2016) (same).

punctuation omitted). Naples made no affirmative steps to remove intent as an issue, and he does not argue otherwise.

Further, as mentioned above, the relevance of other acts evidence offered to show intent is established when the prior act was committed with the same state of mind as the charged crime. See Bradshaw, 296 Ga. at 657 (3); State v. Jones, 297 Ga. 156, 160-161 (2) (773 SE2d 170) (2015). Here, Naples's intent in committing the prior acts against G. N. and A. T. was the same as the intent the State needed to prove with respect (at least) to the charged offense of cruelty to children in the first degree — the offense on which Naples's felony murder charge was predicated. Such an offense is committed when a person "maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (b). We have held that the mental state required to commit this offense must involve either "the absence of all elements of justification or excuse and the presence of an actual intent to cause the particular harm," or "the wanton and wilful doing of an act with an awareness of a plain and strong likelihood that such harm might

20

result." Banta v. State, 282 Ga. 392, 397 (5) (651 SE2d 21) (2007). Naples's violent acts toward G. N. and A. T. — which included swinging A. T. upside down and shaking her, as well as grabbing G. N. by the neck and throat — certainly can be described as "wanton and willful," committed "with an awareness of a plain and strong likelihood" that the children would suffer "excessive physical or mental pain."[8] So the Rule 404 (b) evidence concerning these two children was relevant to prove the intent Naples had at the time he caused Kaylee's injury. See Bradshaw, 296 Ga. at 657 (3).[9]

---

[8] Some of Naples's acts toward the two children, as described by witnesses, were less violent and so may not have involved the same intent as his act toward Kaylee. But to the extent the evidence of those less violent acts was inadmissible, it was harmless. See Harris, 304 Ga. at 281 (4).

Furthermore, we express no opinion as to whether any of Naples's acts toward G. N. and A. T. could warrant a conviction under OCGA § 16-5-70 (b). All we are deciding is that, for the purpose of showing relevance under Rule 404 (b), Naples's intent in committing the crime against Kaylee was the same as his intent in committing the violent acts against G. N. and A. T.

[9] Because the Rule 404 (b) evidence concerning G. N. and A. T. was relevant to prove intent, we need not decide whether it was also relevant to prove lack of mistake or accident, as the trial court found. We do note, however, that considerations of "intent" and "lack of mistake or accident" overlap to a significant degree in this case.

The second prong of the Rule 404 (b) test requires the evaluation of the other acts evidence under Rule 403. In this regard, the evidence of Naples's abuse of A. T. and G. N. was highly probative. This evidence shows that Naples exercised supervisory and disciplinary authority over them, just as he did with Kaylee, and given the very young age of those two children, they had no more ability than Kaylee to escape or resist his violence. Moreover, Kaylee was found lifeless at the bottom of the stairs leading to the basement, and this fact created an obvious implication at trial that she had accidentally fallen down the stairs. Although the defense did not expressly contend that Kaylee's death was an accident, the State bore a heavy burden to overcome this implication, which was supported by Naples's account to one of the jailhouse informants, and the evidence of Naples's intent toward Kaylee was instrumental in doing so.

Naples nevertheless suggests that the other acts evidence had minimal probative value because the other acts involved violence that was provoked in some way, whereas no evidence suggests that

Kaylee did anything on the night in question to provoke him. This argument, however, ignores the testimony of the two jailhouse informants. According to Matthews, Naples told him that Kaylee was "fussy and tired" as he was putting the girls to sleep; that she was "crying real loud in his ears," so much so that he covered her mouth and "yelled at her [to] shut up"; and that she was kicking him when Naples finally "snapped" and threw her down the stairs. The other informant testified that Naples told him that Kaylee "was crying and getting on everybody's nerves" when she fell down the stairs. Thus, Naples's violent attack on Kaylee involved circumstances comparable to those of the violent acts toward G. N. and A. T.

Naples also argues that "repeated testimony from multiple witnesses" about the abuse of G. N. and A. T. was erroneously admitted because it constituted "needless presentation of cumulative evidence" under Rule 403. We disagree. The testimony about those two children described mostly different incidents, and while there may have been some overlap, we do not believe this

23

evidence was so "needlessly cumulative" as to warrant its exclusion under Rule 403. Likewise, although some of the testimony about G. N. and A. T. had substantial prejudicial effect, we cannot say that the high probative value of this evidence was so "outweighed by the danger of unfair prejudice" that the trial court abused its discretion when it admitted it. See OCGA § 24-4-403; Olds v. State, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016) ("[T]he exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." (Citation and punctuation omitted)). See also Hood v. State, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016) ("The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (Citation and punctuation omitted)).[10]

---

[10] We also conclude that the Rule 404 (b) evidence about G. N. and A. T. was based on sufficient proof and so satisfied the third prong of the Rule 404 (b) test. See OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact . . . ."); Bradshaw, 296 Ga. at 658 (3) (the other act evidence under Rule 404 (b) must be proved by a "preponderance of the evidence"). Naples's only challenge to the sufficiency of proof is that there were "insufficient details" presented about the neck-grabbing incident with Mason. But as we noted earlier, the admission of evidence about Mason and the other adults was at most harmless error.

3. Naples argues that he was denied the effective assistance of counsel in several respects. To obtain relief on a claim of ineffective assistance of counsel, a defendant generally must show both that his lawyer's performance was deficient and that this deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). An attorney performs deficiently under Strickland if he does so in an "objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Thomas v. State, 303 Ga. 700, 702 (2) (814 SE2d 692) (2018) (citation and punctuation omitted). Prejudice is shown by demonstrating "a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different." Miller v. State, 285 Ga. 285, 286 (676 SE2d 173) (2009) (citation and punctuation omitted). "If either

<u>Strickland</u> prong is not met, this Court need not examine the other prong." <u>Palmer v. State</u>, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

(a) Naples first argues that his trial lawyer performed deficiently when he failed to object to testimony that, while dating Beck, Naples had sexual relationships with his wife Mandy and another woman; that several of Beck's relatives disapproved of Naples or his relationship with Beck; that, when Naples found out that his first wife was pregnant, he told her there was a "solution to it"; and that he was interested in mixed martial arts. Naples contends that this testimony constituted bad character evidence that was unfairly prejudicial.

With regard to Naples's multiple, concurrent sexual relationships, his trial lawyer testified at the hearing on the motion for new trial that he did not object to this evidence because he did not think it was harmful — there was not much doubt that Naples was having sex with his wife Mandy, and his being an "alley cat" did not make him a murderer. Moreover, the lawyer testified, Naples's multiple affairs tended to show that he was not as fixated on Beck

26

or as jealous of her as the State suggested. We cannot say that trial counsel's strategic rationale for not objecting to this evidence was unreasonable. See McNair v. State, 296 Ga. 181, 183 (2) (766 SE2d 45) (2014) ("[A] tactical or strategic decision made by counsel cannot form a basis for ineffective assistance of counsel unless it was so patently unreasonable that no competent attorney would have chosen it." (Citation and punctuation omitted)); Ford v. State, 290 Ga. 45, 49 (5) (c) (717 SE2d 464) (2011) (counsel's decision to not object to testimony that placed defendant's character at issue was a "matter of [reasonable] trial tactics" and so did not amount to ineffective assistance).

As to the other testimony about which Naples complains — that Beck's relatives disliked or disapproved of Naples, that there was a "solution" to his ex-wife's pregnancy, and that Naples was interested in mixed martial arts — our review of the record shows that the statements at issue, even if objectionable, were not particularly disparaging of Naples's character when viewed in context, especially given the strength of the other admissible

27

evidence against him. Thus, there is no reasonable probability that, even if Naples's trial lawyer had objected to this testimony and the objection had been sustained, the outcome of the trial would have been different. See Lupoe v. State, 300 Ga. 233, 244 (5) (794 SE2d 67) (2016) (defendant failed to show Strickland prejudice, even assuming his lawyer performed deficiently in failing to object to certain testimony reflecting negatively on defendant).

(b) Naples next argues that he was denied the effective assistance of counsel when his own lawyer elicited prejudicial testimony from Tollefson, Beck, and other witnesses.[11] The record

---

[11] Specifically, Naples complains about (1) testimony from Tollefson (a) that she went to DFCS to file a complaint weeks after giving birth to A. T., (b) that Naples's abuse of A. T. occurred at both her and her parents' houses, (c) that Tollefson was "not sure" that Naples would not harm her or her child, (d) that she did not want Naples to know her address, (e) that, after her divorce, she would drop off A. T. to see Naples only if Naples's mother was present, (f) that Tollefson had a protective order and safety plan in Cherokee County, (g) that A. T.'s maternal grandparents saw bruises on A. T., and (h) that Naples left the Army after two or three months; (2) testimony from Naples's sister-in-law that Mandy had obtained a temporary protective order against Naples; (3) testimony from Naples himself that he had not seen A. T. in eight or nine years; and (4) testimony from Beck (a) that, a few days before Kaylee's fatal injury, Naples got mad and said he "couldn't handle" Beck talking to her husband, and (b) that, on the day before Kaylee's injury, Naples called Beck a slut and a liar in front of G. N., grabbed Beck's cell phone, looked through it, and again called her a liar.

shows, however, that much of the testimony Naples complains about — including Tollefson's testimony about her attitude toward Naples and Beck's testimony about Naples's behavior in the days preceding Kaylee's injury — was actually elicited by the State in some form during direct examination. On cross-examination, Naples's lawyer simply probed this direct testimony, which was not an unreasonable tactic. See Morrison v. State, 303 Ga. 120, 126 (5) (b) (810 SE2d 508) (2018) ("Decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel." (Citation and punctuation omitted.)). Cf. McAllister v. State, 258 Ga. 795, 798 (5) (375 SE2d 36) (1989) ("The purpose of cross-examination is to provide a searching test of the intelligence, memory, accuracy, and veracity of the witnesses, and it is better for cross-examination to be too free than too much restricted." (Citation and punctuation omitted)).

Moreover, none of the specific questions that the trial lawyer used to elicit the testimony at issue strikes us as patently unreasonable. To the extent that some of the testimony elicited on

cross-examination had not been heard before, it was not so startling or derogatory to Naples — in light of the other evidence — that no reasonable attorney would have risked eliciting it.[12] We conclude that defense counsel's examination of these witnesses was not constitutionally deficient. See Morrison, 303 Ga. at 126 (5). See also Gordon v. State, 273 Ga. 373, 379 (4) (f) (541 SE2d 376) (2001) (defense counsel had strategic reason for eliciting testimony on cross-examination that defendant had been on "parole").

(c) Naples contends that he was denied the effective assistance of counsel when his trial lawyer failed to impeach two adverse witnesses — jailhouse informant Matthews and Joyce Lackey (Beck's aunt). Naples contends that their respective testimonies

---

[12] One of the statements Naples takes issue with — that Mandy had obtained a temporary protective order against him — was not actually elicited by defense counsel. Rather, the witness mentioned it spontaneously as part of her answer to a different question. Specifically, defense counsel asked Danielle Naples whether she "had any kind of relationship with [Naples's family members] about the last two and a half years." Danielle responded: "Well . . . just to be specific, when I decided to help Mandy get the TPO against [Naples], to protect her and [G. N.], the family disowned us and basically didn't want anything to do with us. The mother stopped talking to both me, my husband, and our children, and none of them, aside from Joe, really talked to us at all."

contained certain inconsistencies that his lawyer should have exploited.[13] The record, however, shows that the testimonies of Matthews and Joyce were not actually inconsistent in the ways Naples asserts. Thus, Naples's lawyer could not have impeached Matthews and Joyce on those grounds, and so Naples fails to show any deficient performance in this regard.

(d) Lastly, Naples argues that he was deprived of the effective assistance of counsel when his lawyer declined the trial court's invitation to provide a Rule 404 (b) limiting instruction with regard to evidence that Naples hit and smacked Beck on the day before Kaylee suffered her fatal injury. We disagree. The transcript shows

---

[13] Specifically, Matthews testified on cross-examination that he had communicated to the State's investigator Naples's statement that he intended to hide Kaylee's body in the woods. Because the written report of the investigator's interview with Matthews makes no mention of this statement, Naples argues, defense counsel should have called the investigator as a witness to impeach Matthews. The record shows, however, that the statement at issue was made to the investigator in another interview that was not the subject of the written report. As to Joyce, she testified on direct examination that, during the apple festival on October 13, she saw Naples snatch an ice cream away from Kaylee and give it to G. N. On cross-examination, Joyce could not recall whether she mentioned this incident to an officer who interviewed her. Naples argues that his lawyer was ineffective when he failed to impeach Joyce with her failure to mention the incident to the officer.

that Naples's trial lawyer had a strategic reason for declining the court's invitation. Based on the colloquy between the lawyer and the trial court, the lawyer wanted this evidence to be admitted without limitation because the incident could be characterized as consensual roughhousing between Beck and Naples and because, according to the lawyer, Beck's story about the incident changed over time, providing fertile ground for impeachment. With the lawyer's agreement, the trial court admitted this evidence not under Rule 404 (b), but as testimony about "the facts and circumstances of the relationship and what happened the day . . . leading up to the child's death." We cannot say that counsel's strategy with respect to this evidence was unreasonable.[14] See McNair, 296 Ga. at 183 (2).

Judgment affirmed. All the Justices concur, except Melton, C. J., not participating.

---

[14] Naples claims that, even if his lawyer had a strategy for not requesting a limiting instruction on this particular evidence, the lawyer had no strategy for not requesting a limiting instruction on the "plethora" of other Rule 404 (b) evidence. But the trial court did give a Rule 404 (b) limiting instruction during trial with respect to several witnesses who testified about Naples's abuse of G. N. and A. T., and the trial court also gave an instruction during the final jury charge as to all evidence admitted under Rule 404 (b). For these reasons, Naples has failed to show ineffective assistance under Strickland with regard to a Rule 404 (b) limiting instruction.

32

DECIDED FEBRUARY 10, 2020.
Murder. Cherokee Superior Court. Before Judge McElyea.

*Barry M. Hazen*, for appellant.

*Shannon G. Wallace, District Attorney, Rachelle L. Carnesale, Cliff Head, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.