310 Ga. 209
FINAL COPY

S20A0872. RAWLS v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Donnel Rawls was convicted of malice murder and feticide in connection with the killing of his pregnant girlfriend, Amber Beckwith. Appellant argues that his convictions were not supported by the evidence presented at his trial, that hearsay evidence of his prior abuse of Beckwith was improperly admitted, that the jury was improperly instructed on flight, and that his trial counsel provided ineffective assistance in several ways. We see no reversible error, so we affirm.[1]

---

[1] The crimes occurred on February 3, 2015. In February 2016, a Clayton County grand jury indicted Appellant for malice murder, two counts of felony murder (based on burglary and aggravated assault), burglary, two counts of aggravated assault, three counts of aggravated battery, and feticide. Appellant was tried from October 17 to 20, 2016. After the State presented its case, the trial court directed a verdict of not guilty on the counts of burglary and felony murder based on burglary. The jury convicted Appellant of the remaining counts, and the court sentenced him to serve two consecutive terms of life in prison without parole for malice murder and feticide. The remaining felony murder count was vacated by operation of law, and the aggravated assault counts merged into the malice murder conviction. Although the court originally

1. The evidence presented at Appellant's trial showed the following.[2] In the summer of 2014, Appellant and Beckwith began dating. In September or October of that year, Beckwith moved from Florida to Forest Park, Georgia, to live with Appellant in the house he was renting. Beckwith started a tax preparation business with her close friend and former co-worker Deborah Jones Lawrence, and Appellant sometimes worked for the business. Soon after Beckwith moved to Georgia, her relationship with Appellant began to deteriorate. They often argued because Appellant wanted Beckwith to give him more money. Beckwith told her close friends and family about several instances when Appellant physically abused her, including slapping her, pulling out her hair, pulling her to the

sentenced Appellant for each of the three aggravated battery counts, the court later vacated those sentences and merged those counts into the malice murder conviction. Appellant filed a timely motion for new trial, which he amended with new counsel in November 2017. After an evidentiary hearing, the court denied the motion in August 2018. Appellant then filed a timely notice of appeal, and the case was docketed to the April 2020 term of this Court and submitted for a decision on the briefs.

[2] Because this case requires an assessment of the harmful or prejudicial effect of certain alleged trial court errors and deficiencies of trial counsel, we lay out the evidence in detail and not only in the light most favorable to the verdicts.

2

ground, punching her, and choking her.[3] Around the beginning of November, Beckwith became pregnant. She was excited to have a baby, but Appellant was not, and he urged her to have an abortion. Beckwith often stayed with Lawrence after she and Appellant had argued. In the time period leading up to Beckwith's murder on February 3, 2015, she was staying with Lawrence three to four times a week, including on the night before the murder. Appellant was scheduled to be evicted from his house on February 4.

On the morning of February 3, Beckwith argued with Appellant over the phone because he had used her debit card. She then changed her debit card passcode as well as the password for the tax business's financial information. That afternoon, Appellant came to the business office and asked Beckwith for the password; she refused to give it to him. That evening, Appellant talked to a friend about Appellant's imminent eviction. After the friend refused Appellant's request to move in with him, Appellant offered him a

---

[3] As discussed in Division 3 below, Appellant objected to some of the testimony describing this abuse as inadmissible and prejudicial hearsay.

couch and other furniture, saying, "Where I am going, I won't need any furniture anyway." Appellant also said that he did not want Beckwith to have the baby. Appellant's friend said that it was too late for an abortion, but Appellant "just kept saying, she is not having my baby."

At around 7:45 p.m., Beckwith and Lawrence left their business office. Beckwith told Lawrence that she was going to Appellant's house "because [he] wanted to talk to her about the baby and that he was going to leave." Appellant was still at the office when Beckwith left, doing some work for his cousin, Melissa Anthony. Anthony testified that when Appellant was finished, he asked her to follow him to his house because his vehicle tags were expired. She did and saw him enter his neighborhood; then she drove home. Around 9:00 p.m., shortly after Anthony had left Appellant, he called her and said that he was going to come by her apartment later.

Also around 9:00 p.m., Beckwith's good friend Nekia Barnes called her, and they talked for 15 or 20 minutes. Beckwith told

Barnes that she was at the house waiting for Appellant so they could "discuss the baby and what things would be moving forward" because Beckwith was "done" and going to stay with Lawrence. Near the end of the call, Barnes heard Beckwith say "hey, Donnel," and Appellant respond, "hey, what's up." Beckwith then ended the conversation, saying that she was going to talk to Appellant and would call Barnes in the morning.

About 45 minutes later, Appellant arrived at Anthony's apartment. His pants had blood on them, and his left hand, which is his dominant hand, was swollen. Appellant did not answer when Anthony asked him what happened. She then asked directly if Appellant had killed Beckwith, and he "looked at her strange, but he didn't answer." Before he left, he hugged Anthony and said, "this is probably the last time you're going to see me," which is something that he often would say to Anthony, but then he added, "no, I'm for real."[4]

---

[4] Appellant's ex-wife, Rasheeda Rawls, testified that Anthony called her about a week after Beckwith's death and gave her this account. Anthony

Around 5:00 the next morning, Appellant was driving in Ocala, Florida, when his SUV's tire blew out. He contacted his friend Corey Battey, who lived in Ocala, and Battey picked up Appellant. Battey later told the police that they went to a Walmart, where he bought Appellant ointment for his left hand, which was covered with napkins or paper towels. Battey also picked up a MoneyGram for Appellant and pawned Appellant's computer. Appellant claimed that he could not get the MoneyGram or pawn his computer himself because his identification card had expired. Battey then had someone from his friend's towing company tow Appellant's SUV. Appellant left the SUV with the towing company, explaining that because the vehicle was not drivable, he could not do what he was planning to do in Florida and wanted to go to Texas instead. Battey bought Appellant a bus ticket to Texas. The SUV was later searched, and dress pants and dress shoes were found inside. The pants and one of the shoes had blood on them, which contained DNA from

claimed at trial that she did not see blood on Appellant's pants or that his hand was swollen and that she did not talk to Appellant when he came to her apartment.

Beckwith and Appellant.

Later the same morning back in Georgia, a deputy with the Clayton County Sheriff's Department and a maintenance employee of the property owner arrived at Appellant's house to evict him. The front and back doors were locked, and there were no signs of forced entry. When there was no response to the deputy's knocks on the door, he used the property owner's key to enter. As he walked through the house, he did not see any signs of struggle. He then found Beckwith lying face-down on top of a lamp on the floor in the master bedroom. Her head and neck were bloody; blood was pooled around her body; and there were blood stains elsewhere in the room that were consistent with her being struck repeatedly by a person standing behind or above her. There were also blood stains on the floor in the living room and hallway and on the door and the lock on the door leading to the carport; these blood stains contained Appellant's DNA.

Beckwith suffered nearly 40 injuries "in her head area," including multiple skull fractures, a fractured jawbone, and

bleeding in her brain, all caused by blunt force trauma. Her hyoid bone was broken and her neck was dislocated, indicating that she also had been strangled. The medical examiner testified that the bleeding in her brain and the dislocation of her neck were equally likely to have caused her death. The medical examiner confirmed that Beckwith was 12 to 15 weeks pregnant at the time of her death and the unborn child also died. Appellant did not testify at trial.

2. Appellant argues that this evidence, which was circumstantial, did not exclude the hypothesis that he was already on his way to Florida when Beckwith was killed. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). However, the evidence — including testimony about Appellant's animosity toward Beckwith and the pregnancy, Barnes's testimony that she heard Appellant arrive at the house where Beckwith was on the night of the murder, his appearance and behavior when he went to Anthony's apartment less than an hour

8

later, Beckwith's blood on the pants and shoe found in Appellant's SUV, his blood in the house, the lack of signs of a forced entry, and his sudden nighttime departure from Georgia — was easily sufficient for the jury to reject as unreasonable the hypothesis that Beckwith was killed by an unknown intruder after Appellant left for Florida. See *Smith v. State*, 307 Ga. 680, 684 (838 SE2d 321) (2020) ("Whether an alternative hypothesis raised by the defendant is 'reasonable' is a question committed principally to the jury." (citation and punctuation omitted)).

Appellant also argues that the evidence was insufficient to support his convictions as a matter of constitutional due process under *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). But when properly viewed in the light most favorable to the verdicts, the evidence summarized above was easily sufficient for a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See id. See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any

9

conflicts or inconsistencies in the evidence.'" (citation omitted)).

3. Appellant next contends that the trial court erred by admitting the testimony about his prior abuse of Beckwith given by four witnesses — Barnes, Katrina Ramos, Melody Paschal, and Anthony — because that evidence was inadmissible under OCGA §§ 24-8-807 ("Rule 807") and 24-4-403 ("Rule 403").[5] At trial, Appellant objected only to certain testimony from Barnes and Ramos and only based on Rule 807. The trial court overruled those objections, and we review those rulings for an abuse of discretion. See *Miller v. State*, 303 Ga. 1, 4 (810 SE2d 123) (2018).[6] Because Appellant did not object to Barnes's or Ramos's prior difficulties testimony based on Rule 403 and did not object to Paschal's or Anthony's prior

---

[5] Appellant also complains about alleged prior difficulties testimony given by his ex-wife Rawls, but is not clear what testimony he believes was objectionable. He does not point to any specific testimony, and it does not appear that Rawls gave any testimony about Appellant's prior difficulties with Beckwith. Thus, we need not consider this contention any further. See *Jacobs v. State*, 306 Ga. 571, 575 (832 SE2d 363) (2019) ("[I]t is not this Court's responsibility to cull the record to find support for a defendant's claims.").

[6] Although Appellant did not object every time Barnes or Ramos testified about the prior difficulties, we will, for ease of analysis, assume that Appellant's objections were sufficient to preserve for ordinary abuse of discretion review his Rule 807 claims as to these two witnesses, because as discussed below he has failed to show any error with respect to their testimony.

10

difficulties testimony at all, we review those claims only for plain error. See *Smart v. State*, 299 Ga. 414, 420 (788 SE2d 442) (2016). To establish plain error, Appellant must show a "clear or obvious error" that he did not affirmatively waive and that affected his substantial rights, meaning that it probably affected the outcome of the trial. Id. at 420-421. If those three requirements are met, we may remedy the error if it "'seriously affect(s) the fairness, integrity or public reputation of judicial proceedings.'" Id. (citation omitted).

(a) Rule 807 says, in pertinent part:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
> (1) The statement is offered as evidence of a material fact;
> (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

This exception applies "only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and

11

necessity are present." *Smart*, 299 Ga. at 421 (citation and punctuation omitted). Statements admissible under Rule 807 are "'considered sufficiently trustworthy not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made.'" Id. at 421-422 (citation omitted). Appellant argues that the State has not shown that the prior difficulties testimony of the four witnesses had sufficient guarantees of trustworthiness or that the testimony met the requirements listed in paragraphs (1) and (2) of Rule 807.

(i) Barnes, Ramos, and Paschal testified that that they had close relationships with Beckwith. Barnes had been "best friends" with Beckwith for 12 years before her death, and they talked on the phone three to four times a day. Ramos was Beckwith's cousin, and Beckwith was like a "little sister" to her; they often confided in each other, especially about relationships. Paschal was Beckwith's sister and had a "great" and "close" relationship with her. Each woman testified that Beckwith had talked about her relationship with Appellant, including describing certain incidents when Appellant

12

had been physically violent toward her.

Beckwith told Barnes about an incident in September or October of 2014 when Appellant hit her in the face and about three incidents in the month before the murder, during which Appellant pulled her down by her hair, hit her head on a sidewalk, and hit her and pulled her to the ground in their living room. Beckwith also told Barnes that Appellant repeatedly locked her out of the house. Beckwith told Ramos about two other incidents of violence — when Appellant slapped her and shoved her on the bed, and when Appellant punched her on the shoulder. Ramos also testified more generally that Beckwith had told her "four or five different times" that Appellant hit her. Paschal testified generally about Appellant's violence, explaining that Beckwith said that Appellant thought he could "put his hands" on her at any time and that he "dragged her by her hair, pulled her hair out, beat her up, [and] slammed her head on the cement."

Beckwith's close relationship with each of these witnesses gave her statements to them about the abuse she was experiencing from

13

her boyfriend sufficient guarantees of trustworthiness to be admissible under Rule 807. See, e.g., *Jacobs v. State*, 303 Ga. 245, 251 (811 SE2d 372) (2018) ("[T]he trial court did not abuse its discretion in determining that the statements from [the victim] to her friends . . . describing the nature of her abusive relationship with [the appellant] prior to her death had the requisite 'exceptional guarantees of trustworthiness' to be admissible at trial pursuant to Rule 807."); *Smart*, 299 Ga. at 422 ("We cannot say that statements from a wife to her friends or family, . . . which describe acts of domestic violence, do not, in fact, bear an increased level of trustworthiness.").

This testimony about Appellant's prior violent acts against Beckwith also met the requirements in paragraphs (1) and (2) of Rule 807. The testimony was material as evidence of "the nature of the relationship between [Appellant] and the victim [that] sheds light on [Appellant]'s motive in committing the offense[s] charged." *Flowers v. State*, 307 Ga. 618, 621 (837 SE2d 824) (2020). See also *Smart*, 299 Ga. at 418 ("[The] testimony was relevant to help the

14

jury understand why Appellant might have used violence against [the victim].”). And Appellant has not shown that there was other evidence that the State could have procured with reasonable efforts that would have been more probative to show Appellant's prior abuse of Beckwith than the testimony of her close confidants. See *Smart*, 299 Ga. at 422 (“[I]n light of the often-secretive nature of domestic violence, we can also envision that such statements [to the victim's friends and family] might be highly probative.”). Thus, it was not an abuse of discretion for the trial court to admit Barnes's and Ramos's testimony under Rule 807, nor was it a clear or obvious error for the court to admit Paschal's testimony.

(ii) Anthony's testimony is a somewhat closer question, because there was no evidence that she had a particularly close relationship with Beckwith. As mentioned above, Anthony is Appellant's cousin. She testified that on Thanksgiving Day in 2014, she saw Beckwith with bruises on her arm and leg, and Beckwith explained that she and Appellant had just had a fight during which she threw a bottle at Appellant and he pushed her into a door.

15

We need not decide whether it was clear or obvious error for the trial court to admit Anthony's testimony under Rule 807, because Appellant has not shown that this testimony likely affected the outcome of his trial. We note first that Anthony's testimony about seeing bruises on Beckwith was not hearsay. See *Davenport v. State*, 309 Ga. 385, 391 (846 SE2d 83) (2020). Beckwith's attribution of the bruises to a fight with Appellant was hearsay, but the jury would likely have inferred that cause in any event given the other testimony about Appellant's abuse of Beckwith that was properly admitted under Rule 807. See *Davenport*, 309 Ga. at 391 (holding that it was harmless to admit under Rule 807 a DFCS caseworker's testimony about the appellant's prior abuse of the victim that was cumulative of properly admitted testimony from the victim's family and other witnesses).

Moreover, the overall evidence against Appellant was very strong. Appellant believed that Beckwith was not giving him enough money and was unhappy with her pregnancy. He was with Beckwith at their house around 9:00 on the night she was murdered, and there

is no evidence that anyone else was there that night. When Anthony saw Appellant around 9:45 p.m., his hand was injured, his pants were bloody, and he declined to answer when asked directly if he had killed Beckwith. Appellant's blood was found in the house, and his and Beckwith's blood was found on pants and a shoe in the SUV that he drove to Florida in the middle of the night. In light of this evidence, Appellant has not shown that Anthony's testimony about one more physical fight between Appellant and Beckwith probably affected the outcome of the trial.

(b) Rule 403 says:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

As discussed above, evidence of Appellant's prior abuse of Beckwith was probative to show the nature of their relationship and his possible motive for killing his pregnant girlfriend. See *Flowers*, 307 Ga. at 623 ("The evidence did not show merely that the appellant had engaged in a prior act of domestic violence, but, instead, it

17

showed the nature of the relationship between the appellant and [the victim] and his motive in shooting her."). Determining that the probative value of the prior difficulties testimony was not substantially outweighed by its prejudicial impact would not be an obvious error. See id.

Appellant also argues that the testimony from these four witnesses should have been excluded under Rule 403 because it was needlessly cumulative. It is true that Beckwith's close friend and business partner Lawrence also testified about Appellant's abuse of Beckwith, describing four specific incidents, one of which was also discussed by Barnes.[7] The two witnesses gave somewhat different accounts of that incident, however, with Lawrence testifying that Appellant choked Beckwith and Barnes testifying that Appellant hit Beckwith in the face. Although a total of five witnesses testified about Appellant's abuse of Beckwith, three of these witnesses (Barnes, Anthony, and Lawrence) also gave important testimony

---

[7] Appellant makes no argument that Lawrence's testimony was inadmissible under Rule 807.

18

about the night of the murder; Appellant's prior acts of abuse were by no means the focus of the trial. Compare *Strong v. State*, 309 Ga. 295, 317 (845 SE2d 653) (2020). Most of the prior acts testimony from each of the five witnesses discussed different incidents, and where there was an overlap, the witnesses gave different accounts. Thus, determining that the prior acts testimony from Barnes, Ramos, Paschal, and Anthony was not needlessly cumulative would not be an obvious error. See *Naples v. State*, 308 Ga. 43, 53 (838 SE2d 780) (2020) (holding that the testimony of several witnesses about the appellant's prior abuse of his children was not a "needless presentation of cumulative evidence," explaining that "[t]he testimony about those two children described mostly different incidents, and while there may have been some overlap, we do not believe this evidence was so 'needlessly cumulative' as to warrant its exclusion under Rule 403" (punctuation omitted)).

For these reasons, Appellant's challenges to the admission of the prior difficulties evidence all fail.

4. At the State's request, the trial court instructed the jury that

19

it could consider evidence of Appellant's "alleged flight" as circumstantial evidence of his guilt.[8] Appellant objected to this instruction during the charge conference on the ground that an instruction on flight is improper under *Renner v. State*, 260 Ga. 515, 518 (397 SE2d 683) (1990), but he did not renew his objection to the instruction after the jury was charged. On appeal, he claims that the flight instruction was improper and that the instruction given was confusing. Because Appellant did not properly preserve either claim, we review them only for plain error, applying the same standard discussed in Division 3 above. See OCGA § 17-8-58 (b); *Collins v. State*, 308 Ga. 515, 519 (842 SE2d 275) (2020) ("[A]n objection made at the charge conference does not by itself preserve an objection to

---

[8] The trial court gave the following instruction:
Evidence of alleged flight has been introduced. The flight of a Defendant is governed by the rules concerning circumstantial evidence you have already been given. If you find from the evidence beyond any reasonable doubt that the Defendant fled, and that his flight was for the purpose of avoiding arrest for the charge in the indictment as opposed to some other reason, you may take this fact into consideration in determining the Defendant's guilt or innocence. Furthermore, you may consider it, if you find it more likely than not that the Defendant actually committed such act, and that the reason was to evade the charge now on trial.

an instruction as subsequently given[.]").

(a) *Renner* held that it would henceforth be error for a trial

court to instruct the jury on flight because the instruction

> "serves no real purpose, as it is a particularization of the
> general charge on circumstantial evidence, and as the
> state is free to use circumstantial evidence of flight to
> argue the defendant's guilt. . . . Moreover, the charge
> inevitably carries with it the potential of being
> interpreted by the jury as an intimation of opinion by the
> court that there is evidence of flight and that the
> circumstances of flight imply the guilt of the defendant;
> this is especially true since the trial court does not give
> specific charges on other circumstances from which guilt
> or innocence may be inferred."

260 Ga. at 518 (citation and punctuation omitted).[9] The State argues

that this holding is no longer good law under the current Evidence

Code, because an instruction on flight has been allowed in federal

courts.[10]

---

[9] *Renner* did not apply its holding to the case before the Court, but rather announced that the holding would apply to "cases tried after the date on which this opinion appears in the advance sheets of the Georgia Reports, 260 Ga. 515 (January 10, 1991)." 260 Ga. at 518 n.2. We do not address this aspect of *Renner*.

[10] The State has made this argument before. See *Burlison v. State*, 353 Ga. App. 341, 344 (836 SE2d 736) (2019) (pretermitting whether *Renner*'s holding still applied in light of the new Evidence Code because the flight instruction was harmless).

We have explained many times that we look to federal case law for guidance when a provision of Georgia's current Evidence Code mirrors a federal rule of evidence. See, e.g., *Jacobs*, 303 Ga. at 249. But *Renner*'s holding was about *jury instructions*, not about the admission or exclusion of *evidence*. See *Gates v. State*, 298 Ga. 324, 328 (781 SE2d 772) (2016) (explaining that Georgia's Evidence Code deals with rulings that admit or exclude evidence). *Renner* did not reject instructions on flight because evidence of a defendant's flight was inadmissible under the old Evidence Code; to the contrary, *Renner* explained that evidence of flight may be admissible as circumstantial evidence of guilt, see 260 Ga. at 517-518, which remains true under the current Evidence Code, see *State v. Orr*, 305 Ga. 729, 741 (827 SE2d 892) (2019). Thus, there is no reason to conclude that the current Evidence Code abrogated *Renner*'s holding on a jury instruction issue.

As for the persuasiveness of the federal case law approving jury instructions on flight, such authority existed before *Renner* was decided, see, e.g., *United States v. Borders*, 693 F2d 1318, 1327-1328

(11th Cir. 1982), and the State identifies nothing about that case law that would make it more persuasive than it was when this Court decided *Renner*. Accordingly, the trial court committed a clear and obvious error by instructing the jury on flight in disregard of *Renner*.[11]

Nevertheless, Appellant has not shown that the flight instruction that the trial court gave likely affected the outcome of his trial. Under *Renner* and the current Evidence Code, the jury was entitled to find that there was evidence that Appellant fled to avoid arrest after he killed his girlfriend, as there was evidence that, after showing up with bloody pants and a swollen hand at his cousin Anthony's apartment, he told her that she would never see him again, drove to Florida in the wee hours of the night, and then

---

[11] The State notes that the following comment was added at some point to the pattern instruction on flight: "[W]ith the advent of new rules, authority from the 11th Circuit and other published legal authority suggest that [*Renner*'s holding that it is error to charge on flight] MAY no longer be the [law]." Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.36.10 (4th ed. 2007, updated January 2020). This comment, which does not explain why unidentified "new rules" or federal authority would impact Georgia precedent about jury instructions, was not a proper basis for the trial court to disregard a clear precedent of this Court.

obtained a bus ticket to Texas after his SUV broke down.[12] *Renner* also makes clear that the State was free to argue this flight evidence as circumstantial evidence of Appellant's guilt. See 260 Ga. at 518.

And although *Renner* expressed concern that a flight instruction might be construed by the jury as an improper comment on the evidence under OCGA § 17-8-57, the instruction given in this case stated that evidence of "alleged flight" had been "introduced" and could be considered as circumstantial evidence of Appellant's guilt, under the instructions concerning circumstantial evidence in general, *if* the jury found that he committed acts of flight and that his purpose was to avoid arrest. There is no reason to believe that this particular instruction caused the jury to give undue weight to the flight evidence, particularly given the other strong evidence against Appellant. See, e.g., *Howard v. State*, 307 Ga. 12, 20-21 (834 SE2d 11) (2019) (holding that although a jury instruction on spoliation should not have been given in a criminal case, it was

---

[12] Appellant's argument that there was no evidence of flight to support an instruction therefore fails.

harmless); *Burlison v. State*, 353 Ga. App. 341, 344 (836 SE2d 736) (2019) (holding that an assumed *Renner* error was harmless in light of the strength of the evidence).

(b) Appellant also argues that the flight instruction referenced conflicting standards of proof, and it is true that the instruction indicated that the jury should apply both a "beyond any reasonable doubt" and a "more likely than not" standard in deciding whether Appellant fled to avoid arrest. However, in the final jury charge, the jury was instructed several times about the State's burden to prove Appellant's guilt of the charged offenses "beyond a reasonable doubt." Considering the jury instructions as a whole, the court's isolated reference to the preponderance standard in an instruction about one minor type of evidence did not "'clearly mislead or confuse the jury'" as to the State's burden of proof as to Appellant's guilt. *Delacruz v. State*, 280 Ga. 392, 398 (627 SE2d 579) (2006) (citation omitted) (holding that the trial court's isolated misstatement, "if you do *not* believe from the entire evidence that the defendant is guilty beyond a reasonable doubt, you may convict," was not reversible

25

error given the jury charges as a whole (punctuation omitted; emphasis in original)). Thus, Appellant has failed to show a likely effect on the outcome of his trial.

5. Appellant contends that his trial counsel provided ineffective assistance in several ways. To prove these claims, Appellant must show "that his counsel's performance was professionally deficient and that such deficient performance resulted in prejudice." *Brewner v. State*, 302 Ga. 6, 15 (804 SE2d 94) (2017). See also *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Appellant must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. See *Brewner*, 302 Ga. at 15. To prove prejudice, Appellant must show a reasonable probability that, in the absence of his counsel's deficient performance, the result of the trial would have been different. See id. If Appellant fails to establish either deficient performance or prejudice, this Court is not required to examine the other. See id.

26

(a) Appellant argues first that his trial counsel was ineffective with respect to the testimony about prior difficulties between Appellant and Beckwith because counsel did not request a limiting instruction at the time the testimony was introduced and did not seek to limit the number of prior difficulties witnesses.

In the final jury charge, the trial court instructed:

> Evidence of prior difficulties between the Defendant and the alleged victim has been admitted for the sole purpose of illustrating, if it does, the state of feeling between the Defendant and the alleged victim. Whether this evidence illustrates such matters is a matter solely for you, the jury, to determine. But, you are not to consider such evidence for any other purpose.

There is no requirement that a limiting instruction be given at the time evidence of prior difficulties is introduced, nor has Appellant shown that if the jury had been given this limiting instruction earlier in the trial, the result would have been different. See *Brewner*, 302 Ga. at 15-16. Thus, Appellant has established neither deficient performance by his trial counsel nor prejudice to his case.

Similarly, there is no established limit on the number of prior difficulties witnesses that may testify. See, e.g., *Naples*, 308 Ga. at

27

53 (holding that it was not error to admit testimony from six witnesses about the appellant's abuse of his children); *Smart*, 299 Ga. at 419-422 (holding that it was not plain error for the trial court to admit hearsay about prior difficulties from two witnesses, Facebook messages, text messages, and letters written by the victim). To the extent Appellant is arguing that his trial counsel should have objected to the prior difficulties evidence on the ground that it was needlessly cumulative, that objection would have failed for the reasons discussed in Division 3 (b) above. Appellant has therefore failed to show that an effort to limit the number of prior-difficulties witnesses would have been successful, and "the failure to raise a meritless motion or objection is not ineffective assistance of counsel." *Moore v. State*, 293 Ga. 676, 679 (748 SE2d 419) (2013).

(b) Next, Appellant contends that his trial counsel performed deficiently by failing to file a motion to suppress the evidence found during the search of his SUV. As discussed above, on February 4, 2015, the day after the murder, Appellant left his SUV with a towing company in Ocala and obtained a bus ticket to Texas. Eight days

later, on February 12, Appellant's friend Battey contacted the Ocala Police Department and told them about his interaction with Appellant. The Ocala police had the SUV taken to their secure evidence bay, and they contacted the Forest Park police. Two days later, on February 14, officers from the Forest Park police obtained a search warrant for the SUV, and the vehicle was searched the same day.

Appellant argues that the evidence obtained from the search was subject to suppression because "more than ten days had passed [between] the date of the issuance of the search warrant and its execution, thereby rendering the search warrant stale."[13] The factual premise of this argument is incorrect. The record shows that the search was actually executed on the same day the warrant was issued, and the search warrant was issued and executed only two days after the Ocala police took possession of the SUV and notified

---

[13] Appellant also says that the search warrant evidence was subject to suppression because the SUV "was taken by the police from the designated intermediary before a warrant was obtained." Appellant, however, offers no argument or citation to case authority to support this one-sentence assertion. This argument has therefore been abandoned. See Supreme Court Rule 22.

the Forest Park police. This timing would not require a finding that the warrant was based on stale information. See, e.g., *Mitchell v. State*, 239 Ga. 456, 458 (238 SE2d 100) (1977) ("The information in the affidavit was not so stale as to make it unlikely that the suspect's pants observed on March 9 would not be in his home on March 11 when the warrant issued, or on March 12 when it was executed.").

Appellant may be trying to argue that the passage of time between the murder and the issuance of the search warrant rendered the warrant stale. However,

> "'[s]taleness' as [it] relates to probable cause is not always measured by the interval between the commission of the crime and the issuance of the search warrant. 'Staleness' as [it] relates to probable cause is measured by the probability that the thing to be seized is located at the place to be searched . . . ."

*Lemon v. State*, 279 Ga. 618, 622 (619 SE2d 613) (2005) (quoting *Mitchell*, 239 Ga. at 458). Although about 11 days passed between the murder and the issuance of the warrant, there was a high likelihood that evidence relating to the murder remained in the SUV that Appellant had driven away from the murder scene and then left

with a towing company. Thus, a motion to suppress on the ground that the search warrant was based on stale information would have failed, and trial counsel did not perform deficiently (or cause any prejudice) by failing to file a meritless motion. See *Santana v. State*, 308 Ga. 706, 712 (842 SE2d 14) (2020) ("When trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." (citation and punctuation omitted)).[14]

(c) Finally, Appellant argues that his trial counsel provided ineffective assistance by not objecting to testimony about a shoe print. During the trial, a Forest Park police sergeant testified that there was a partial "shoe print" on the floor in the hallway leading toward the master bedroom where Beckwith's body was found. The

---

[14] In ruling on this claim in its order denying Appellant's motion for new trial, the trial court held both that the search warrant was not stale and that Appellant did not have standing under the Fourth Amendment to challenge the search because he abandoned the SUV. Because we conclude that the search warrant was not stale, we need not also decide whether Appellant had Fourth Amendment standing.

sergeant then testified that the sole of one of the dress shoes found in Appellant's SUV "looked similar" to the shoe print found at the murder scene. Appellant did not object to any of this testimony. On cross-examination, however, trial counsel got the sergeant to admit that he was not sure it actually was a shoe print. The sergeant explained that there was no tread pattern and "the only thing that led [him] to believe" that it was a shoe print was its location, because "one of the things that transfers on the floor is usually . . . a shoe." He also acknowledged that his opinion about the similar sole of the dress shoe was "just an eyeball" observation, not a scientific conclusion, and that he did not have any expert accreditation to conclude that one matched the other. Photographs of the purported shoe print and of the dress shoe sole were admitted into evidence.[15]

Appellant now argues that the sergeant's testimony was not proper lay witness testimony because the jury had the same information that the sergeant had for comparing the shoe print and

---

[15] The photograph of the purported shoe print looks like it may be in blood, but there was no testimony about that.

the dress shoe sole. See OCGA § 24-7-701 (a).[16] We need not decide whether the sergeant's testimony about the shoe print was properly admitted, however, or whether trial counsel acted unreasonably by failing to object, because this testimony did not likely affect the result of the trial. As described above, the sergeant substantially qualified his testimony, admitting that his comparison of what only might have been a shoe print with the dress shoe sole was just an "eyeball" evaluation and that he had no special qualification to make a comparison. It is unlikely that the jurors would have deferred to this tentative testimony rather than comparing the purported shoe print and shoe sole on their own. And even assuming that the jury did credit the sergeant's testimony, it likely carried little weight in light of the other, much stronger evidence that Appellant killed

---

[16] OCGA § 24-7-701 (a) says:

(a) If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are:

(1) Rationally based on the perception of the witness;

(2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and

(3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

Beckwith. Accordingly, Appellant has failed to show a reasonable probability that, in the absence of the sergeant's testimony, the result of the trial would have been different. See *Naples*, 308 Ga. at 54.

6. The trial court's evidentiary error assumed in Division 3 (a) (ii) and the deficiency of trial counsel assumed in Division 5 (c), even when viewed cumulatively, did not likely affect the result of the trial. See *State v. Lane*, 308 Ga. 10, 17-18 (838 SE2d 808) (2020) (holding that at least as to evidentiary issues, this Court must "consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel"). As discussed in those subdivisions, the assumed error and deficiency each created very little prejudice, and the evidence against Appellant was very strong.

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*

34

Decided October 19, 2020.

Murder. Clayton Superior Court. Before Judge Collier, Senior Judge.

*John K. Kraus*, for appellant.

*Tasha M. Mosley, District Attorney, Elizabeth A. Baker, Karen S. Barbour, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.