321 Ga. 880
FINAL COPY

S25A0062. ARNSDORFF v. THE STATE.

PINSON, Justice.

Tony Arnsdorff and Scott Pinholster were jointly indicted but separately tried for malice murder and other crimes related to the death of Courtney Wells.[1] The evidence at trial showed that days

---

[1] Wells died on January 10, 2017. On March 19, 2018, an Effingham County grand jury returned an indictment that charged both Pinholster and Arnsdorff, individually and as parties to the crime, with malice murder (Count 1), felony murder (Counts 2, 3), aggravated assault (Counts 4, 5), aggravated battery (Count 6), possession of a firearm during the commission of a felony (Counts 7-9), and concealing the death of another (Count 10), all arising from the shooting death of Wells. Arnsdorff alone was charged with tampering with evidence (Count 11).

Their trials were severed, and Arnsdorff alone was tried by a jury from September 9-10, 2019, and found guilty of all counts. The trial court sentenced Arnsdorff to life without the possibility of parole for malice murder (Count 1) followed by a consecutive term of ten years to serve in prison for concealing the death of another (Count 10) and then a consecutive term of five years to serve in prison for possession of a firearm during the commission of a felony (Count 7); he was also sentenced to a term of five years in prison for tampering with evidence (Count 11) to be served concurrently with Count 10. The remaining counts merged or were vacated by operation of law.

Arnsdorff timely filed a motion for new trial, which he later amended through new counsel. After a hearing on October 13, 2021, the trial court denied the motion for new trial, as amended, on October 24, 2022. On February 15, 2023, Arnsdorff moved to set aside that order because it had not been provided to his counsel until after the time to appeal had expired. The trial court granted that motion and reissued the order denying the motion for new trial

before her death Wells got into an argument with Pinholster, with whom she had a romantic relationship, and left Pinholster's home to stay with Arnsdorff for a few days. Then, when Arnsdorff tried to take Wells back to Pinholster's home, she refused to go and left Arnsdorff, who drove to Pinholster's home alone. Pinholster then spent the next day trying to find where Wells had gone, all the while remaining in constant contact with Arnsdorff. Once Pinholster found out where Wells was staying, Arnsdorff hid in the back seat of Pinholster's truck when Pinholster picked Wells up, and he stayed hidden until they reached a remote area. There, Arnsdorff revealed himself and punched Wells in the face moments before Pinholster retrieved a shotgun from the back seat (where Arnsdorff had just

---

on February 15, 2023. Arnsdorff thereafter filed a notice of appeal from that order. But because the trial court did not vacate its October 24, 2022 order before issuing the new one, this Court dismissed the appeal as untimely. See *Arnsdorff v. State*, Case No. S23A0819 (Ga. May 16, 2023). After the remittitur was transmitted to the trial court, Arnsdorff filed a second motion to set aside the order on his motion for new trial on July 10, 2023. On July 3, 2024, the trial court entered an order that vacated the October 24, 2022 and February 15, 2023 orders and denied the motion for new trial as amended. Arnsdorff filed a timely notice of appeal from that order on July 25, 2024. His appeal was docketed to the term of court beginning in December 2024 and submitted for a decision on the briefs.

been hiding) and shot Wells multiple times. Arnsdorff then helped move Wells's body from the roadway, did not report the crime, and initially lied to the police about what he knew about Wells's death.

On appeal Arnsdorff contends that his convictions should be reversed because the evidence was not sufficient to prove that he caused Wells's death or that he was a party to Pinholster's crimes against her. He also contends that the trial court plainly erred by charging the jury on flight and by instructing the jury that Arnsdorff's statements should be received with "great care and caution." Finally, he argues in the alternative that if the Court concludes there was sufficient evidence to support his malice murder conviction, the trial court erred by imposing a five-year felony sentence instead of a misdemeanor sentence for tampering with evidence (Count 11).

Each claim fails. When viewed in the light most favorable to the verdict, see *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), the evidence of Arnsdorff's conduct

before, during, and after Wells was shot was constitutionally sufficient to show he was a party to the crimes of malice murder and possession of a firearm during the commission of a felony. Even viewing the evidence as reasonable jurors would instead, see *Johnson v. State*, 316 Ga. 672, 674 (1) n.2 (889 SE2d 914) (2023), the trial court's error in instructing the jury on flight likely did not affect Arnsdorff's substantial rights, so he has not shown plain error. He also has not established plain error in regard to the instruction that his out-of-court statements should be received with "great care and caution" because he has not shown that giving this instruction was a clear and obvious error. Finally, the trial court did not err by imposing a felony sentence for tampering with evidence.

1. Arnsdorff contends that there was not sufficient evidence that he committed the crimes of malice murder and possession of a firearm during the commission of a felony or that he was a party to

Pinholster's commission of those crimes.[2] Instead, he says the evidence showed that Pinholster shot and killed Wells, and Arnsdorff was merely present during the shooting.

In considering whether evidence was constitutionally sufficient as a matter of federal due process, we view the evidence in the light most favorable to the verdict and evaluate whether the evidence authorized rational jurors to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Scoggins v. State*, 317 Ga. 832, 833 (1) (896 SE2d 476) (2023). A jury may find a defendant guilty of a crime if it finds beyond a reasonable doubt that the defendant directly committed the crime or if he was a "party thereto," meaning he "cause[d]" another person to commit the crime, "aid[ed] or abet[ted]" its commission, or "[i]ntentionally advise[d], encourage[d], hire[d], counsel[ed], or procure[d]" another to commit

---

[2] To the extent that Arnsdorff purports to challenge the sufficiency of the evidence supporting Counts 2-6 and 8-9, those challenges are moot because those counts either merged or were vacated by operation of law. See, e.g., *Weems v. State*, 318 Ga. 98, 100 (2) n.2 (897 SE2d 368) (2024). And he does not challenge the sufficiency of the evidence to convict him of Count 10 (concealing a body) or Count 11 (tampering with evidence), so we do not review them. See *Davenport v. State*, 309 Ga. 385, 398-399 (4) (b) (846 SE2d 83) (2020). We address the sufficiency of the evidence as to Counts 1 and 7 only.

the crime." OCGA § 16-2-20 (a), (b) (1)-(4).

(a) Viewed in the light most favorable to the verdict, the evidence at trial showed the following.

On January 15, 2017, the body of a deceased woman, later identified as Wells, was found 40 or 50 feet from a "really remote" dirt road. It was later determined that Wells died from multiple shotgun wounds to the head, neck, torso, and upper extremities. Various personal belongings were found near Wells's body, including a letter with her name on it that had been sent to the address where Pinholster lived. Investigators later learned that Wells had been in a romantic relationship with Pinholster.

The police executed a search warrant at Pinholster's home and located a fired Remington shotgun shell in a jewelry box, a wooden box full of Remington and Rio shotgun shells, and two 12-gauge shotguns, one of which was loaded with Rio shells. A Rio shell was collected from the crime scene.

A GBI firearms and toolmarks examiner determined that both the Rio shotgun shell collected near Wells's body and the Remington

6

shotgun shell found in the jewelry box in Pinholster's home were fired from the same firearm. But they were not fired from either of the shotguns found in Pinholster's safe.

Soon after the police told Wells's stepfather about her death, Pinholster came to Wells's stepfather's home to give his condolences even though Wells's stepfather had been told he was the only person outside of law enforcement who had been informed of the death. Around the same time, Wells's stepfather saw Arnsdorff driving a four-wheeler "real slow" across the street. Wells's stepfather had seen Wells with Pinholster before and recognized Arnsdorff but did not know him.

Wells's brother spoke to Wells on the phone on the day she was killed. She told him Arnsdorff had kicked her out of his truck and was going to throw her belongings in a ditch near Wells's family's home. This was the first time Wells had mentioned Arnsdorff to her brother. Wells also wrote on Facebook that Arnsdorff had her belongings in his truck.

On the same day that Wells's body was found, Sergeant John

Bradley of the Effingham County sheriff's office spoke to Arnsdorff, who denied knowing anything about Wells's death. Two days later, Arnsdorff was interviewed by Investigator Richard Beckum and told Beckum he had been with Wells on January 8, 2017, until about 12:30 a.m. the next morning. Arnsdorff said that he and Wells had gotten into an argument, and she left his home and started walking down Highway 80; Arnsdorff said that was the last time he saw her. Arnsdorff said that, after Wells left, he went to Pinholster's home "for a few minutes" and then to a home in Pembroke, Georgia, where he stayed until 3:00 p.m. on January 9. Arnsdorff also said he had "heard a lot of things" including that the Mexican Cartel was after him and Wells and that the Ghost Face Gangsters were possibly involved. Arnsdorff also gave a written statement that was consistent with what he told Beckum, and the statement was admitted into evidence and read to the jury.

Several months later, Sergeant Bradley and Erick Riner, a former investigator for the district attorney's office, interviewed

Arnsdorff. Arnsdorff was not under arrest at the time of the interview. Arnsdorff told them that Wells had been "in and out of his life for a few years." Arnsdorff said he was at Pinholster's home when Pinholster and Wells got into an argument. Wells then put her belongings in Arnsdorff's truck, and Arnsdorff drove Wells to his home, where they stayed for around three days.

Arnsdorff said he learned that Pinholster had a letter for Wells and that he planned to drive Wells to Pinholster's home to collect the letter on January 8. But when Wells learned he was driving her to Pinholster's home, she got out of the truck and walked toward her family's home, and Arnsdorff continued to Pinholster's home alone. Wells's belongings were still in Arnsdorff's truck when he arrived at Pinholster's home, and Pinholster went through the belongings and found items that belonged to his daughter and "got mad." Pinholster then took a .38-caliber revolver and "went looking for" Wells. While Pinholster was looking for Wells, he remained in touch with Arnsdorff. Meanwhile, Arnsdorff went to a hotel in Pembroke where

9

he said he smoked marijuana with another person, watched television, and fell asleep.

At first, Arnsdorff told investigators that he did not have "firsthand knowledge of what had happened to [Wells]." Arnsdorff's account "changed, however, as the interview continued." He said Pinholster told him he knew where Wells was and "ordered" Arnsdorff to lie down in the back seat of the truck as Pinholster went looking for Wells. Pinholster then drove the truck to a home where he picked up Wells and then drove to a dirt road. Arnsdorff remained in the back seat or floorboard of the truck as Pinholster drove. Wells "started bad-mouthing Arnsdorff" (who was still hiding in the back seat) and "telling lies about him," so he sat up when Pinholster told him to and "punched [Wells] in the mouth." Arnsdorff also said that Wells had a "photo of him on [her] cell phone that could be incriminating" and he wanted her to delete it.

According to Arnsdorff, Wells then got out of the truck, and he moved to the front passenger seat. Pinholster then reached under the back seat, pulled out a shotgun, positioned the shotgun across

Arnsdorff's chest and out the passenger window, and fired at Wells five or six times. After that, Pinholster got out of the truck and Arnsdorff heard "multiple" gunshots.

Arnsdorff said that after Pinholster shot Wells, he got back in the truck and started to drive away but then turned around and went back to where they had left Wells's body. Pinholster took Wells's cell phone, left, and later "destroyed the phone" and threw it out the passenger window. (But Arnsdorff said this was not the phone with the supposedly incriminating photo on it.) Pinholster then turned the truck around and again returned to Wells's body. Pinholster and Arnsdorff pulled her body out of the roadway and to the nearby wood line where her body was found on January 15.

Records for cell phones associated with Pinholster and Wells were introduced into evidence through a Verizon Wireless records custodian. These records included copies of text messages, call information, and cell site information. Investigators also received records

11

from AT&T for a phone number that was associated with Arnsdorff.[3]

Unlike Verizon, AT&T does not store the contents of text messages.

The records showed that Wells's phone called Pinholster's phone at 5:35 a.m. on January 9, 2017, and the call lasted a little over 58 minutes. Just after 6:30 that morning (so right after the call between Pinholster's phone and Wells's phone ended), Pinholster's phone placed a call to Arnsdorff's phone then sent a text to Arnsdorff's phone saying, "Bubba, you've got to call me back right now. She just called me, I know where she's at, and she's supposed to be coming here." Pinholster's phone also called Wells's phone a second time, soon after calling and texting Arnsdorff's phone, and that call lasted around 12 minutes. Pinholster's phone then sent another text to Arnsdorff's phone: "Call me back now." There were then several calls made between Pinholster's phone and Arnsdorff's phone, which lasted a total of almost 42 minutes. After this series of calls, Pinholster's phone called Wells's phone twice, then called

_____

[3] The State introduced the AT&T phone records along with a declaration of authenticity. See OCGA §§ 24-8-803 (6); 24-9-902 (11).

Arnsdorff's phone again.

That evening, Pinholster's phone called both Wells's and Arnsdorff's phones several times between 5:12 p.m. and 8:41 p.m. Pinholster's phone continued to communicate with both Wells's and Arnsdorff's phones that night. At 11:18 p.m., Pinholster's phone sent a text to Arnsdorff's phone: "You ready??" Less than a minute later, Pinholster's phone sent two texts to Wells's phone: "Are you coming over Babydoll?" and "I'm still up." A text from Wells's phone said, "Yea," and then Pinholster's phone sent another text to Wells's: "I wanna go dirt road ridin[g.]" A reply came from Wells's phone: "Well, give me a sec[ond], bring the best stuff you got and I'll go with." Pinholster's phone then called Wells's phone (the call lasted less than two minutes), and his phone then immediately called Arnsdorff's phone twice. Pinholster's phone then sent a text to Arnsdorff's phone: "Call me man[,] right now[.] It's so f\*\*king important[.] Call me back right now[.]" Pinholster's phone then placed a call to Wells's phone that lasted less than a minute; sent a text to Wells's phone:

13

"Really?"; and placed another call to her phone that lasted 58 seconds. Pinholster's phone then sent a series of text messages to Wells's phone: "I'm not gonna come if you're not gonna answer the phone baby. I don't know where you are."; "Babydoll. I need you to call me now. I'm not joking. I know where your at already"; "Are you ready for me to come get you?"; "I've got everything you need. Are you ready?"; "And I mean everything!"; "And I talked to [T]ony [Arnsdorff]. I know where your stuff is too." Pinholster's phone then placed another call to Wells's phone that lasted less than one minute.

The phone records showed that at 12:34 a.m. on January 10, 2017, Wells's phone was located on Shirley Drive, near the home where Pinholster picked her up. The records showed that Wells's phone sent a text message to Pinholster's phone at 1:06 a.m. but it was not received on his phone until after 2:01 a.m., which suggested Pinholster's cell phone was powered off or out of service at the time the text message was sent. The last "ping" on Wells's phone was at 2:02 a.m., one minute after Pinholster's phone was powered on and

14

it received the delayed text message. Cell site location data placed both Wells's and Pinholster's phones at Riverside Drive at that time. AT&T's "true-call record" showed that Arnsdorff's cell phone was located at a motel in Pembroke, Georgia at that time.

Two hours later, at 4:14 a.m., Pinholster's phone sent a text to Wells's phone that was never received. It read, "I just wanted to let you know I made it home a while ago, lol. Sorry. I hope you're gonna be ok at that roach motel." There were no further messages between Pinholster's phone and Wells's phone after that.

(b) The evidence at trial was sufficient to support the jury's finding that Arnsdorff was guilty of malice murder. The required criminal intent for malice murder — whether the defendant directly committed the crime or was a party to another's direct commission — is malice, which incorporates the intent to kill. See *Scoggins*, 317 Ga. at 836 (1) (a); OCGA § 16-5-1 (a). And although presence alone is not enough to convict someone of a crime, a defendant's "presence, companionship, and conduct before, during, and after" the crime may authorize the jury to reasonably infer he shared the criminal

intent of the person who directly committed the crime. See *Scoggins*, 317 Ga. at 836 (1) (a) (citation and punctuation omitted). Here, the evidence at trial showed that both Arnsdorff and Pinholster had argued with Wells in the days before she was killed. There was also evidence that, while Pinholster directly communicated with and arranged to meet Wells on the night he shot her, Pinholster also remained in continuous contact with Arnsdorff as he made those arrangements. The evidence of the timing and contents of Pinholster's text messages and phone calls to Wells and Arnsdorff leading up to the shooting authorized the jury to reasonably infer that Pinholster was updating Arnsdorff about his plans to meet Wells throughout the day. The evidence also showed that Arnsdorff hid from Wells in the back seat of Pinholster's truck when they picked Wells up, and Arnsdorff remained hidden as Pinholster drove Wells to the remote location where he later shot her. When they got to the remote location, Arnsdorff revealed himself, punched Wells, and moved to the front passenger seat of the truck, and Pinholster retrieved his shotgun from the back seat, where Arnsdorff had been hiding moments

before, and shot Wells. So the jury could infer that Arnsdorff knew about the shotgun. Considering these inferences together, the evidence — when viewed in the light most favorable to the jury's guilty verdict, see id. at 833 (1) — authorized the jury to conclude that Pinholster kept Arnsdorff informed of his progress in locating and arranging to meet with Wells in the hours leading up to her death, and Arnsdorff hid in the back seat with the shotgun because the two men shared an intent to shoot and kill Wells, with whom they had each recently argued. Even if the evidence showed that Pinholster, not Arnsdorff, pulled the trigger, the jury was authorized to infer from Arnsdorff's admitted presence during the crime combined with his conduct before — including his argument with Wells, calls and texts with Pinholster as Pinholster sought to locate and arranged to meet Wells, his hiding in the back seat when Pinholster picked up Wells, and his punching Wells in the face — and after — including helping move Wells's body from the roadway and not reporting the crime — that he shared Pinholster's criminal intent to kill Wells. See id. at 836 (1) (a). So there was sufficient evidence that Arnsdorff was a

party to the crime of malice murder. See id.

(c) The evidence was also sufficient to support the jury's finding that Arnsdorff was guilty of possession of a firearm during the commission of a crime. For this offense, it is not necessary for the State to prove that the defendant personally possessed a weapon as long as it proves he acted as a party to this crime. See *Stroud v. State*, 318 Ga. 744, 750-751 (2) (900 SE2d 619) (2024). Because the evidence showed that Wells died from gunshot wounds inflicted by Pinholster, and we have already concluded that the jury was authorized to conclude that Arnsdorff shared Pinholster's criminal intent to shoot Wells, there was sufficient evidence that Arnsdorff was a party to the crime of possession of a firearm during the commission of a felony. See id.

2. Arnsdorff contends that the trial court erred by instructing the jury that it could consider evidence of flight and that it should consider his out-of-court statements with "great care and caution."

As Arnsdorff acknowledges, he did not object to either instruction at trial, so we review these claims only for plain error. See *Baker*

*v. State*, 320 Ga. 156, 161 (2) (907 SE2d 824) (2024); OCGA § 17-8-58 (b). To establish plain error, a defendant must show that an error was not affirmatively waived, was clear and obvious beyond reasonable dispute, and affected his substantial rights, meaning that it likely affected the outcome. See *Baker*, 320 Ga. at 161-162 (2). And if that showing is made, then we have the discretion to remedy the error if it "seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (citation and punctuation omitted). If any one of these requirements is not met, a claim of plain error fails. Id.

(a) At the State's request, the trial court gave the following instruction to the jury on flight:

> Ladies and gentlemen, evidence of alleged flight has been introduced. Such evidence is governed by the rules concerning circumstantial evidence you have already been given. Furthermore, you may only consider it if you find more likely -- if you find it more likely than not that the Defendant actually committed the acts and that the reason was to evade the charges on trial now.

We have long held that it is clear and obvious error to instruct a jury that it may consider evidence of a defendant's flight. See

19

*Rawls v. State*, 310 Ga. 209, 219 (4) (a) (850 SE2d 90) (2020) (citing *Renner v. State*, 260 Ga. 515, 518 (3) (b) (397 SE2d 683) (1990)). So Arnsdorff has shown that the trial court committed a clear and obvious error.

But Arnsdorff's claim of plain error fails because he has not established that this instructional error likely affected the jury's verdict.[4] See *Baker*, 320 Ga. at 161-162 (2). The trial court's instruction, although improper, referred to Arnsdorff's "alleged flight" and instructed the jury that it could "only consider" this circumstantial evidence of guilt "if" the jury found he had "actually committed the acts" of flight to "evade the charges on trial now." See *Rawls*, 310 Ga. at 219 (4) (a). This particular instruction likely did not "cause[ ] the jury to give undue weight to the flight evidence." Id. The only evidence offered by the State that Arnsdorff "fled" was the evidence that he did not stay at the crime scene or report the crime after Wells was shot. And that evidence was only a small piece of the balance of

---

[4] The parties do not contend that the error was affirmatively waived, and nothing in the record appears to indicate so. See *Baker*, 320 Ga. at 161-162 (2).

evidence against Arnsdorff, which was significant. See id.

In assessing harm from an instructional error, we "review the record de novo" and "weigh the evidence as we would expect reasonable jurors to have done." See *Johnson*, 316 Ga. at 674 (1) n.2 (citation and punctuation omitted). Viewed in that way, there was significant evidence that Arnsdorff had argued with Wells soon before she was killed, was in constant communication with Pinholster before they picked up Wells on the night she was killed, hid from Wells in the back seat of Pinholster's truck where the shotgun was located, and helped move her body. Given this evidence, the specifics of the jury instruction, and the limited evidence of flight, there is little reason to believe that the instruction caused the jury to give undue weight to the flight evidence in reaching its guilty verdict, such that it likely affected the jury's verdict. See *Rawls*, 310 Ga. at 219-220 (4) (a). So Arnsdorff has not shown that this error likely affected his substantial rights and, thus, has not established plain error. Id.

(b) The trial court gave the following charge to the jury:

Ladies and gentlemen, you should consider with

great care and caution, the evidence of out of court statements allegedly made by the Defendant offered by the State. You, the jury, may believe in any such statement in whole or in part, believing that which you find to be true and rejecting that which you find to be untrue. You, alone, have the duty to apply the general rules for testing the believability of witnesses and to decide what weight, if any, you should give to all or any part of the statement. A Defendant's out of court statement that is not supported by other evidence is not sufficient to justify a conviction, even if you believe the unsupported statement.

Arnsdorff contends that the trial court plainly erred by giving this instruction, pointing to a pair of Court of Appeals decisions that discouraged the use of this charge and called for the pattern charge to be revised. See, e.g., *Jones v. State*, 359 Ga. App. 688, 692 (2) n.3 (859 SE2d 845) (2021); *McKenzie v. State*, 293 Ga. App. 350, 353 (3) (667 SE2d 142) (2008). But neither decision held that giving this instruction was error, see id., and this Court has held that giving it was not a clear and obvious error, see *Ash v. State*, 312 Ga. 771, 792-795 (5) (a) (865 SE2d 150) (2021). See also OCGA § 24-8-823 ("All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction."). So the alleged

error was not clear and obvious, which means that Arnsdorff has not established plain error for this claim either. Id.

3. Arnsdorff contends that the trial court erred by imposing a felony sentence for tampering with evidence and that the court should have imposed a misdemeanor sentence instead. This claim fails. We have interpreted OCGA § 16-10-94 to require imposing a misdemeanor sentence if the defendant tampered with evidence for the purpose of obstructing his *own* prosecution, even when the underlying crime is a felony. See *Goodman v. State*, 313 Ga. 762, 770 (2) (c) (873 SE2d 150) (2022) (citing *Byers v. State*, 311 Ga. 259, 268 (3) (857 SE2d 447) (2021)).[5] But a person who tampers with evidence "involving the prosecution or defense of a felony and involving another person shall be guilty of a felony" and must be sentenced to

---

[5] We noted in *Goodman* that this interpretation, which appears to have been uncritically imported from a Court of Appeals decision, is doubtful. See id. at 770 (2) (c) n.7 (referring to *English v. State*, 282 Ga. App. 552, 553-556 (2) (639 SE2d 551) (2006)). But we explained there that "our case law is binding until overruled, this case presents a poor vehicle to reconsider it, and considerations of stare decisis might warrant retaining it in any event." Id. Just so here. And added to that, neither party has asked us to revisit that interpretation here, and Arnsdorff's felony sentence would be upheld whether or not that precedent were reconsidered.

serve at least one year in prison and up to ten years if the felony prosecution being tampered with was for a "serious violent felony," which includes murder. See OCGA §§ 16-10-94 (c); 17-10-6.1 (a) (1). That provision applies here: the indictment charged Arnsdorff with tampering with evidence "involving the prosecution of the offense of Scott Pinholster, a felony, with intent to prevent the apprehension of Scott Pinholster, another person" by moving Wells's body and destroying her cell phone. Because Arnsdorff was charged with and convicted of moving Wells's body and destroying her phone to prevent *Pinholster's* apprehension and prosecution for felonies, Arnsdorff was properly sentenced for felony tampering with evidence. See OCGA § 16-10-94 (c).

*Judgment affirmed. Peterson, C. J., Warren, P. J., and Bethel, Ellington, McMillian, LaGrua, and Colvin, JJ., concur.*

24

Decided June 24, 2025.

Murder. Effingham Superior Court. Before Judge Peed.

*Robert L. Persse*, for appellant.

*Daphne J. Totten, District Attorney, Keith McIntyre, Matthew Breedon, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Matthew B. Crowder, Meghan H. Hill, Senior Assistant Attorneys General*, for appellee.